682 P.2d 649

**Gale L. FERREL, Plaintiff-Appellant,**

**v.**

**ALLSTATE INSURANCE COMPANY, Defendant-Respondent.**

**No. 14215.**

Court of Appeals of Idaho.

May 31, 1984.

Jeff Stoker, Twin Falls, for plaintiff-appellant.

Peter G. Snow, Church, Church, Snow & Tuft, Burley, for defendant-respondent.

BURNETT, Judge.

This appeal arises from a dispute over uninsured motorist coverage provided by an automobile insurance policy. Gale Ferrel was injured by an uninsured motorist. He submitted a claim to Allstate Insurance Company under a policy purchased by his father. Allstate denied the claim, contending that coverage did not extend to Ferrel because he was not a resident of his fa-

ther's household. When Ferrel sued, the district court agreed with Allstate and entered summary judgment against the claim. For reasons explained below, we vacate the judgment and remand the case.

On review of a summary judgment our task is to determine whether there exist genuine issues of material fact and, if not, whether the prevailing party below was entitled to judgment as a matter of law. I.R.C.P. 56(c). In this case, the following facts are not controverted. The insurance policy was purchased by Ferrel's father in October, 1977. In addition to the protection provided for Ferrel's father, as the named insured, coverage was extended by the policy to any of his relatives while they were "residents of [his] household."

Ferrel lived at a number of locations while the policy was in force. When the policy was purchased, he was attending Bible school in South Carolina. Shortly thereafter, on June 15, 1978, he was married in Birmingham, Alabama; and on June 17, 1978, he returned to his parents' home in Jerome, Idaho with his new bride. Ferrel and his wife lived there for approximately two months before moving to another home several miles away. During this time Ferrel was employed by his father and brother as a hired hand on their farm.

Approximately in December, 1978, Ferrel left Idaho to pursue employment as a truck driver in Indiana. To the best of Ferrel's recollection, he remained in this occupation until March, 1979, when he and his wife moved back to Birmingham, where he obtained employment as a mechanic. After about two months in this position, Ferrel quit the job and spent a short time working at a dry cleaning establishment.

In July or August, 1979, Ferrel hitchhiked from Alabama to Idaho and again resided in his family's house. He worked briefly as a truck driver for a local farmer and then returned to work on the family farm as a hired helper. By September, 1979, Ferrel had saved enough money to pay for his wife's air transportation from Alabama back to Idaho. Upon her arrival, the couple spent several weeks living in the

family home. Ultimately, a decision was reached that they could make use of a small bunkhouse located seventy-five to one hundred yards from the main residence on the farm. This one-room building was roughly ten feet by fifteen feet in dimension, containing a stove, foldaway bed, and a shower. There was an outhouse nearby. Ferrel testified by deposition that he and his wife ate most of their meals, washed their clothes, used the bathroom facilities, and occasionally watched television at his parents' home. The bunkhouse and main residence were served by a common utility meter, were identified by a common address, and were accessible by a common driveway. In early October, 1979, a marital dispute caused Ferrel's wife to leave Idaho. However, Ferrel remained on the farm and continued using the bunkhouse.

On October 15, 1979, Ferrel sustained a broken pelvis and a brain concussion when a vehicle in which he was riding, driven by an uninsured motorist, crashed in a one-car accident. As noted, Ferrel unsuccessfully made a claim on his father's insurance policy. Disposition of the claim turned upon whether Ferrel was, in the language of the policy, a "resident of the insured's household." The district court, upon the foregoing facts, ruled as a matter of law that he was not.

The proper threshold inquiry is whether the phrase, "resident of the insured's household," has a single, plain meaning or is subject to differing interpretations. The phrase is not fully defined in the policy itself. The policy provides that a resident must be "bodily present in the household, with an intent to remain there," but it does not define "household." The district court, citing BLACK'S LAW DICTIONARY in its memorandum decision, applied the following definition to a household:

> A family living together. [Citation omitted.] Those who dwell under the same roof and compose a family. Webster. A man's family living together constitutes his household, though he may have gone

to another state. BLACK'S LAW DICTIONARY 873 (rev. 4th ed. 1951).

Thus, the district court implicitly treated the term "resident of the insured's household" as having a single, plain meaning, requiring physical presence under one roof.

However, other courts have found the question more complex. In *Mazzilli v. Accident & Casualty Insurance Co. of Winterthur, Switzerland*, 35 N.J. 1, 170 A.2d 800, 804 (1961), the court stated, "household is not a word of art. Its meaning is not confined within certain commonly known and universally accepted limits." Attempting to define a related term, the court in *Government Employees Insurance Co. v. Dennis*, 645 P.2d 672 (Utah 1982), stated with regard to the term "resident":

> [This word] has different shades of meaning depending upon its context. [Citation omitted.] Although the term is frequently found in statutes, contracts and other legal documents, it has no precise technical and fixed definition applicable in all contexts and to all cases. [Citation omitted.] The term is flexible, elastic, slippery and somewhat ambiguous. [*Id.* at 674].

These cases suggest that the term "household" and the phrase "resident of a household" do not have single, plain meanings. Rather, they are subject to varying interpretations. The district court's same-roof interpretation provides one permissible meaning, but several courts have rejected this interpretation. In those cases, family members have been found to be residents of insureds' households even though they resided in separate buildings. In *Mazzilli* a New Jersey appellate court upheld a determination that a woman who lived in a bungalow fifty yards away from her estranged husband's house, on the husband's property, was a resident of his household for the purpose of insurance coverage. In *Workman v. Detroit Automobile Inter-Insurance Exchange*, 404 Mich. 477, 274 N.W.2d 373 (1979), the appellate court affirmed a finding that a husband and wife, who lived in a trailer on the property of the husband's father, were residents of the father's household for the purpose of uninsured motorist coverage. In *Keene v. State Farm Mutual Automobile Insurance Co.*, 114 Ga.App. 625, 152 S.E.2d 577 (1966), a forty-year old man who lived in a small one-room structure on his mother's property was held to be a resident of her household.

It is well settled in Idaho that if an insurance policy may be given either of two meanings, one which permits recovery and one which does not, the meaning more favorable to the insured should be adopted. *E.g., Bonner County v. Panhandle Rodeo Ass'n*, 101 Idaho 772, 620 P.2d 1102 (1980). In this case, the more favorable construction of the phrase "resident of insured's household" is one which does not embody a per se requirement of physical presence under a single roof. Accordingly, we hold that the district court erred by imposing such a requirement.

Absent a same-roof restriction, the question is how to define the geographical limits of a household. In the *Mazzilli, Workman* and *Keene* decisions cited above, the courts—using identical phraseology—held the term "household" to include "persons who live in one house or within the same curtilage." "Curtilage" is an arcane term, the modern meaning of which has been largely determined in cases dealing with search and seizure questions. However, we see no reason why such cases should not be consulted for a workable, general statement of the elements of curtilage. The commonly accepted elements appear to be "a small piece of land, not necessarily enclosed, around a dwelling house[,] generally [including] buildings used for domestic purposes in the conduct of family affairs." *E.g., State v. Kender*, 60 Hawaii 301, 588 P.2d 447 (1978).

The question in this case, then, is whether a bunkhouse located seventy-five to one hundred yards from the main residence could be considered part of the curtilage. In an urban setting, it might be difficult to envision a curtilage of those dimensions. However, on a farm, we hesi-

tate to say—as a matter of law—that "buildings used for domestic purposes in the conduct of family affairs" could not be located at such distances from each other. The question turns upon the purposes for which the buildings were built and used, the relationships among the people involved, and the geographical area in which family affairs commonly have been conducted. These criteria are factual in nature, suitable for determination by a trial court. However, the district court in this case, having rested its analysis solely upon a single-roof definition of a household, has made no such determinations. Moreover, the district court has not reached an additional factual question—whether, if Ferrel were deemed to have been residing within the household, he intended "to remain there" as required by the policy. Our chronology of Ferrel's movements from one residence to another, prior to his accident, demonstrates that a genuine issue of material fact exists on this point.

We conclude that the district court erred by granting summary judgment upon the view that a household cannot extend beyond a single roof. Summary judgment in favor of the insurance company is vacated. Upon remand, the district court shall determine whether there was a sufficient nexus between the main residence and the bunkhouse to treat them as parts of a common household and, if so, whether Ferrel resided there with an intent to remain.

Costs to appellant, Ferrel. Because the outcome of this case remains in doubt, no attorney fees on appeal will be awarded at this time under I.C. § 41–1839. However, if Ferrel prevails on remand, the district court may take this appeal into consideration when determining an appropriate award under the statute.

WALTERS, C.J., and SWANSTROM, J., concur.