923 P.2d 469

**STATE of Idaho, Plaintiff–Appellant,**

v.

**Rodney Karol CADA, Defendant–Respondent.**

**No. 21606.**

Court of Appeals of Idaho.

March 29, 1996.

Rehearing Denied June 11, 1996.

Petition for Review Denied,
Oct. 4, 1996.

Alan G. Lance, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for appellant. John C. McKinney argued.

Featherston Law Firm, Sandpoint, for respondent. Brent C. Featherston argued.

LANSING, Judge.

We are once again called upon to address the complex issue of the scope of constitutional protections against unreasonable searches and seizures. In this case, law enforcement officers made two late night entries onto the driveway to the defendant's home in an effort to determine whether the defendant was engaged in growing marijuana. During these covert visits, the agents smelled marijuana in the vicinity of a garage and, using a thermal imaging device, determined that heat was being emitted from the garage. The information gained on these nighttime visits was then used by the law enforcement officers to obtain a warrant authorizing a search of the garage and the defendant's house. In executing the warrant, officers found marijuana being grown in the garage. The defendant was charged with trafficking in a controlled substance, marijuana, I.C. § 37–2732(B)(a)(1)(C), and failure to affix drug tax stamps, I.C. §§ 63–4205(1), 63–4207(2). The district court, however, suppressed evidence obtained during the night entries and during execution of the search warrant. The court concluded that the evidence presented by the officers in support of their application for the warrant had been obtained through illegal searches of the defendant's property. We affirm the decision of the district court.

## FACTS

On June 21, 1993, a magistrate heard oral testimony in support of an application for a warrant to search the house and certain outbuildings located on rural property leased by Rodney K. Cada. According to this testimony, on May 8, 1993, a confidential informant contacted Agent Gary Landers of the United States Drug Enforcement Administration. The informant described to Landers an automobile that the informant had seen at a garden supply store in Spokane, Washington, which was known to sell equipment commonly used by persons who cultivate marijuana indoors. The informant gave Landers a partial Idaho license plate number for the vehicle and said that the driver, a white male, had emerged from the store carrying a small cardboard box. Landers shared this information with Agent Dan Thornton of the Idaho Bureau of Narcotics. Agent Thornton determined that the described vehicle was registered to Rodney K. Cada.

Based upon this information, on June 9, 1993, at about 10 a.m., Thornton drove to Cada's residence in a rural area of Bonner County and knocked on the front door. On the pretense that he needed directions to another location, Thornton spoke with an adult female who came to the door. After a short conversation, he left. While there, Thornton observed the general layout of the property, which included several outbuildings.

At about 1 a.m. on June 10, 1993, Agent Thornton returned to the Cada property with Agent Landers. The two walked from the county road up Cada's driveway. While on the driveway both agents smelled growing or freshly cultivated marijuana. The odor appeared to be coming from a garage located about 110 feet from the house. The agents continued on the driveway to an area between the garage and the house. They then set up a thermal imaging device and directed it at the garage. The device is a passive, non-intrusive system that detects the surface temperature of an object. The agents concluded that heat coming from the garage was consistent with the amount of heat which would be necessary to grow marijuana. The agents were on the property approximately ten to fifteen minutes during this entry.

The agents returned to the Cada property on June 21, 1993, at approximately 4 a.m. One or both of them wore camouflage clothing. Landers again smelled marijuana coming from the garage. On this visit the agents heard a noise coming from the back of the garage that sounded like an exhaust fan. Agent Thornton testified that in his experience indoor marijuana cultivation operations often have an exhaust system. Thornton set up a motion-activated low light infrared video camera and two infrared sensors in a position hidden among bushes across the driveway from the garage. The camera was focused on the garage. This intrusion onto Cada's property lasted about 45 minutes.

Later that day, both agents presented to a magistrate an application for a search warrant. In addition to testifying to the above facts, they presented evidence from the power company concerning electrical power usage on the property. The magistrate issued a warrant authorizing a search of Cada's residence and the garage. The magistrate's finding of probable cause for the warrant was based "most particularly" on the odor of marijuana detected by the agents.

On June 23, 1993, the warrant was executed. Officers found that the garage contained, in addition to a shop and storage area, more than one hundred marijuana plants. Cada was then arrested.

Cada moved to suppress the evidence obtained during execution of the search warrant and during the two warrantless nighttime entries onto his property. He contended that the agents' warrantless entries violated his rights to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution and Art. I, § 17 of the Idaho Constitution, and that the evidence thereby obtained must be suppressed. He also asserted that the search warrant was invalid because, absent the evidence unlawfully gained through the nighttime visits, there was no showing of probable cause for issuance of a warrant.

The district court concluded that the late night trips onto the property surrounding the home and garage were illegal searches and that the warrant was invalid.[1] Therefore, Cada's motion to suppress was granted. It is unclear whether the district court's decision was based solely upon Art. I, § 17 of the Idaho Constitution or upon both the state and federal constitutions. We will address each.

## ANALYSIS

■ Both the Fourth Amendment and Art. I, § 17 safeguard "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures...." These constitutional provisions are designed to protect an individual's legitimate expectation of privacy that society is prepared to recognize as reasonable. *Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984); *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (1967); *State v. Thompson*, 114 Idaho 746,

---

1. The district court also concluded that, regardless of the propriety of the agents' nighttime entries onto the Cada property, the use of the thermal imaging device was a search that violated Art. I, § 17. Because of our conclusion that the agents' intrusion onto the property became an illegal search even before use of the imaging device, we need not decide whether the use of the device would be an impermissible search under the Idaho Constitution if operated from a constitutionally unprotected vantage point.

760 P.2d 1162 (1988). Warrantless governmental entries into private dwellings are presumptively unreasonable. *State v. Curl*, 125 Idaho 224, 225, 869 P.2d 224, 225 (1993).

■ An application for a search warrant must be supported by facts "sufficient to create probable cause for belief that the forbidden articles are within the place to be searched." *State v. Josephson*, 123 Idaho 790, 794, 852 P.2d 1387, 1391 (1993). *See also State v. Lang*, 105 Idaho 683, 684, 672 P.2d 561, 562 (1983). When tainted evidence has been relied upon for the issuance of a warrant, an appellate court must determine whether the remaining information presented to the magistrate, after the tainted evidence is excluded, contains adequate facts from which the magistrate could have concluded that probable cause existed for issuance of the search warrant. *State v. Johnson*, 110 Idaho 516, 526, 716 P.2d 1288, 1298 (1986). In reviewing an order granting or denying a motion to suppress evidence, an appellate court will defer to the trial court's factual findings unless the findings are clearly erroneous. However, free review is exercised over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found. *State v. Weber*, 116 Idaho 449, 451–52, 776 P.2d 458, 460–61 (1989) *citing State v. Heinen*, 114 Idaho 656, 658, 759 P.2d 947, 949 (Ct.App.1988).

The State argues that, if Agents Thornton and Landers were standing in a location where they had the right to be when they first detected the odor of marijuana coming from Cada's garage, the warrant must be upheld, even if the agents' subsequent further intrusions onto the property violated constitutional standards. That is, the State contends the marijuana odor, together with other evidence obtained prior to the nighttime excursions, would have been sufficient to establish probable cause for issuance of the warrant. Therefore, we focus our analysis on the lawfulness of the agents' conduct at the point when they first noticed the odor of marijuana.

## A. Agents' Location When Marijuana Odor Was First Detected

■ Preliminarily we must address the State's argument that the district court's finding that the agents were on Cada's property when they first smelled marijuana was clearly erroneous. According to the State, testimony at the suppression hearing "plainly showed that the officers had not even crossed onto Cada's property when they first smelled marijuana."

This assertion is without merit. A diagram of the Cada property, drawn to scale, was placed in evidence. The prosecutor asked Agent Thornton to mark the location where he first smelled marijuana on the June 10 visit. On the diagram, Thornton drew an X on the driveway directly to the north of the garage. This mark is over the property line in excess of forty feet. The prosecutor also asked Thornton where Landers had indicated that he (Landers) smelled marijuana on June 21. Thornton drew a circle around the X he had drawn earlier. Although there was conflicting evidence in the record, this testimony constitutes substantial evidence supporting the district court's factual finding that the agents were on Cada's property at the time they initially smelled marijuana on both dates.

Accordingly, we must proceed to determine whether, when the agents smelled marijuana from a vantage point on Cada's property, their activity was proscribed by the federal or state constitution.

## B. Fourth Amendment to the United States Constitution

■ The Fourth Amendment's protection of a person's home from unreasonable searches and seizures extends to the home's "curtilage," that is, to the land immediately surrounding and associated with the residence. *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742. In *Oliver*, the United States Supreme Court referred to the curtilage as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id., quoting Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886). The Court noted that curtilage had been defined "by reference

to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.* The Court in *Oliver* distinguished between the curtilage of a home and "open fields," holding that an individual has no legitimate expectation that open fields will remain private and free from warrantless intrusion by government officers. *Oliver,* 466 U.S. at 181, 104 S.Ct. at 1742–43.

In *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the United States Supreme Court further refined its Fourth Amendment curtilage analysis. The Court identified four factors that generally are to be included in an analysis of curtilage questions: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) steps taken by the resident to protect the area from observation by people passing by. *Id.* at 301, 107 S.Ct. at 1139–40. In *Dunn,* law enforcement officials had made a warrantless entry onto the defendant's ranch property. The 198–acre ranch was completely encircled by a perimeter fence, and the ranch residence was situated one-half mile from the public road. A barn stood approximately sixty yards from the house. During their warrantless entry, the officers crossed over the perimeter fence and one interior fence. Standing midway between the residence and the barn, one agent detected an odor believed to be that of phenylacetic acid. The officers then crossed over another barbed wire fence and a wooden fence that enclosed the front portion of the barn. The officers stood under the barn's overhang and, while shining a flashlight through netting covering an opening, looked into the barn. The United States Supreme Court found that this warrantless search was permissible under the Fourth Amendment because, applying the four factors identified above, the barn was not within the curtilage of the home. Rather, according to the majority opinion, the barn lay within "open fields" not subject to constitutional protection.

In the present case the State contends, and we agree, that under the Supreme Court's holding in *Dunn,* when first detecting marijuana Agents Thornton and Landers had not intruded within the area which, for Fourth Amendment purposes, would be deemed the curtilage of Cada's home. The Cada property is a twenty-acre parcel, most of which is heavily wooded. From the driveway entrance, the roof of the garage is visible. The first segment of the driveway crosses land that is not within Cada's leasehold. Although a rail fence runs along the property line on either side of the driveway, no gate or other barrier crosses the driveway. Photographs show that, from the property line, the garage and some of the other outbuildings are fully visible. From Cada's property line the driveway runs in an east-west direction along the north boundary of the Cada property for approximately seventy feet. The driveway then turns at a right angle heading south toward the house. Cada's house sits at the south end of the driveway approximately 195 feet from north property line. Several outbuildings are clustered around the north-south section of the driveway. The garage is situated on the inside of the "elbow" formed by the turn in the driveway. The residence is 110 feet from the nearest corner of the garage. According to the suppression hearing testimony that was accepted by the district court, when the agents initially smelled marijuana during their first nighttime visit, they were standing on the east-west section of the driveway where it ran parallel to the north end of the garage. They then proceeded around the curve of the driveway and stood in front of the garage door. As they rounded the corner and got closer to the garage the marijuana scent grew stronger. Applying the *Dunn* factors to these circumstances, we note that when the agents initially smelled marijuana, their distance from Cada's home was approximately the same as the distance of the agents from the dwelling in *Dunn;* there was no fence enclosing the Cada garage or driveway area and the home; and the driveway area where the agents stood when first detecting the marijuana odor, as well as the garage itself, were visible to persons gazing down the driveway from outside the Cada property. Although the garage was used partly for domestic purposes, its use also

included cultivation of marijuana. In addition, Agents Thornton and Landers maintained a greater distance from the outbuilding than did the agents in *Dunn,* and they did not find it necessary to climb fences or breach other barriers in order to reach their observation point. With the United States Supreme Court having concluded that Dunn's barn lay outside the curtilage of the ranch house, we are constrained to conclude that, by the standards enunciated in *Dunn* and the manner of their application in that decision, Cada's garage and adjacent driveway area were outside of the curtilage protected by the Fourth Amendment to the United States Constitution.

## C. Art. I, § 17 of the Idaho Constitution

In interpreting Art. I, § 17 of our state constitution, Idaho courts are not bound by interpretations of the Fourth Amendment by the United States Supreme Court. *Thompson,* 114 Idaho at 748, 760 P.2d at 1164; *State v. Newman,* 108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985). "[F]ederal and state constitutions derive their power from independent sources. It is thus readily apparent that state courts are at liberty to find within the provisions of their own constitutions greater protection than is afforded under the federal constitution as interpreted by the United States Supreme Court." *Id.* In *State v. Guzman,* 122 Idaho 981, 988, 842 P.2d 660, 667 (1992), the Idaho Supreme Court explained, "Such independent state analysis does not mean that the Court will reach a result different from the United States Supreme Court; it only means that we are free to do so, if it is determined that a different rule better effectuates our counterpart Idaho constitutional provision." (Citations omitted.)

In *Thompson* the Idaho Supreme Court, interpreting Art. I, § 17, considered whether use of a "pen register" to record numbers called on a telephone was an impermissible search. Our Supreme Court rejected the conclusion reached by the United States Supreme Court in construing the Fourth Amendment in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), that installation of a pen register was not a

search because the telephone user "in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and that, even if he did, his expectation was not 'legitimate.'" *Maryland,* 442 U.S. at 745, 99 S.Ct. at 2583. The Idaho Supreme Court determined, to the contrary, that in Idaho there exists a legitimate and reasonable expectation of privacy in telephone numbers that are dialed and that this privacy interest is protected by Art. I, § 17. *Thompson,* 114 Idaho at 749, 760 P.2d at 1165.

We similarly must determine whether the United States Supreme Court's Fourth Amendment analysis in *Dunn* is applicable to the Idaho Constitution's assurance of freedom from unreasonable governmental searches of houses and effects. It is our conclusion that the view of curtilage expressed in *Dunn* is unduly restrictive and does not reflect the scope of the privacy interest protected by Art. I, § 17 of the Idaho Constitution. We agree with Justice Brennan's statement, dissenting in *Dunn:* "Our society is not so exclusively urban that it is unable to perceive or unwilling to preserve the expectation of farmers and ranchers that barns and their contents are protected from (literally) unwarranted government intrusion." *Dunn,* 480 U.S. at 306, 107 S.Ct. at 1142 (J. Brennan dissenting). We also share the perception, expressed by the Court of Appeals of New Mexico in *State v. Sutton,* 112 N.M. 449, 816 P.2d 518 (Ct.App.1991), that the scope of Fourth Amendment protection established by decisions of the United States Supreme Court may depend upon concepts that:

> have evolved in areas with very different customs and terrain. In New Mexico [and in Idaho] lot sizes in rural areas are often large, and land is still plentiful. Our interpretation and application of the state constitution must take into account the possibility that such differences in custom and terrain gave rise to particular expectations of privacy when the state constitution was adopted.

*Id.* 816 P.2d at 524.

The Idaho appellate courts' past discussions of curtilage have recognized that curti-

lage encompasses domestic outbuildings that are close to and associated with a dwelling. *State v. Sindak,* 116 Idaho 185, 188, 774 P.2d 895, 898, (1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1125, 107 L.Ed.2d 1032 (1990) ("Curtilage is commonly defined as the enclosed space of ground and buildings immediately surrounding a dwelling house."); *State v. Clark,* 124 Idaho 308, 313, 859 P.2d 344, 349 (Ct.App.1993) (referring to curtilage as the "area or buildings immediately adjacent to a home which a reasonable person may expect to remain private even though it is accessible to the public."); *State v. Rigoulot,* 123 Idaho 267, 272, 846 P.2d 918, 923 (Ct. App.1992) (same); *Ferrel v. Allstate Insurance Co.,* 106 Idaho 696, 698, 682 P.2d 649, 651 (Ct.App.1984) ("curtilage" refers to a small piece of land, not necessarily enclosed, around a dwelling house, generally including buildings used for domestic purposes in the conduct of family affairs.).

Many other jurisdictions, including federal courts addressing the issue prior to *Dunn,* have also deemed curtilage to generally include domestic outbuildings that are close to and used in connection with a residence. *United States v. Berrong,* 712 F.2d 1370, 1374 (11th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984) (Curtilage is formed by buildings constituting an integral part of that group of structures making up the farm home.); *Rosencranz v. United States,* 356 F.2d 310 (1st Cir.1966) (Barn was within curtilage; curtilage is "ground and buildings immediately surrounding a dwelling, formerly usually enclosed."); *United States v. Mullin,* 329 F.2d 295, 296 (4th Cir.1964) (Smokehouse seventy-five feet from residence is a domestic building constituting an integral part of a group of structures making up the farm home.); *Walker v. United States,* 225 F.2d 447 (5th Cir.1955) (Barn seventy to eighty yards from house was within curtilage; barn is "a domestic building constituting an integral part of that group of structures making up the farm home."); *United States v. King,* 305 F.Supp. 630, 634 (N.D.Miss.1969) (Barn, smokehouse and other outbuildings are part of the curtilage of a farm residence.); *Hoffman v. People,* 780 P.2d 471, 472 n. 3 (Colo.1989) (Curtilage includes "those outbuildings which are directly and intimately connected with the habitation and in proximity thereto and the land or grounds surrounding the dwelling which are necessary and convenient and habitually used for family purposes and carrying on domestic employment."); *Donaldson v. State,* 134 Ga.App. 755, 216 S.E.2d 645 (1975) (Barn 100 feet from house, and pasture area 200 feet from house and 100 feet from barn, were within curtilage.); *State v. Kender,* 60 Haw. 301, 588 P.2d 447, 449 (1978) ("Curtilage is usually defined as a small piece of land, not necessarily enclosed, around a dwelling house and generally includes buildings used for domestic purposes in the conduct of family affairs."); *State v. Simpson,* 639 S.W.2d 230, 233 (Mo.Ct.App. 1982) ("The curtilage includes all out-buildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence."); *State v. Vicars,* 207 Neb. 325, 299 N.W.2d 421 (1980) (Definition of curtilage same as *Kender, supra;* curtilage included calf shed 100 feet from house on opposite side of a fence.); *State v. Hanson,* 113 N.H. 689, 313 A.2d 730, 732 (1973) ("The curtilage includes those outbuildings which are directly and intimately connected with the habitation and in proximity thereto and the land or grounds surrounding the dwelling which are necessary and convenient and habitually used for family purposes and carrying on domestic enjoyment."); *Luman v. State,* 629 P.2d 1275 (Okla.Crim.App.1981) ("Curtilage includes all outbuildings used in connection with a residence, such as garages, sheds, barns, yards and lots connected with and in close vicinity of the residence."); *Brinlee v. State,* 403 P.2d 253 (Okla.Crim. App.1965) (Lot adjoining the barn and no more than 100 yards from residence is within curtilage.); *State v. Lee,* 120 Or. 643, 253 P. 533, 534 (1927) ("Generally speaking, the curtilage is the space of ground adjoining the dwelling house used in connection therewith in the conduct of family affairs and for carrying on domestic purposes, usually including the buildings occupied in connection with the dwelling house.").

The second and fourth factors identified in *Dunn*—whether the area is

within an enclosure surrounding the home and whether it is protected from observation by passers-by—we find to be of limited assistance in defining the curtilage of a home. Whether an Idaho farmer or rancher has erected extensive fencing around the home and outbuildings may depend upon the individual's sense of aesthetics, dictates of the terrain, and how much fencing the individual can economically afford. In our view, the absence of such a fence should have little effect upon the determination whether the residents may reasonably and legitimately expect privacy within and around barns, shops, garages and other outbuildings. We are also unpersuaded that the visibility of an area to passers-by will generally tend to exclude it from curtilage. While steps taken to protect an area from observation may demonstrate an expectation of privacy, and thus support the area's inclusion within the curtilage, the absence of such steps does not necessarily weigh against a finding of curtilage. We note that with respect to both rural and urban homes, areas that are unquestionably within the curtilage, including front and side yards immediately adjacent to the dwelling, are generally visible from the public streets and roads. Accordingly, in interpreting our state constitution, we decline to adopt the *Dunn* formulation. Instead, we adhere to the description of curtilage heretofore applied by Idaho courts, which encompasses the area, including domestic buildings, immediately adjacent to a home which a reasonable person may expect to remain private even though it is accessible to the public. *Clark,* 124 Idaho at 313, 859 P.2d at 349; *Rigoulot,* 123 Idaho at 272, 846 P.2d at 923.

 If outbuildings are encompassed within curtilage, so must be grounds extending between the home and outbuildings, including paths and drives connecting them. In the case before us, outbuildings and structures were clustered around the driveway that ended at the dwelling house. The garage next to which the agents were standing when the marijuana odor was detected was approximately 110 feet from the home and faced onto the driveway. The house, garage, and other structures, and the driveway onto which the structures all fronted, were within a single clearing surrounded by forested grounds. In our view, the district court correctly held that the driveway areas adjacent to the garage where Agents Landers and Thornton stood when they smelled marijuana were part of the curtilage of Cada's home and therefore fell within the protection afforded by Art. I, § 17 of the Idaho Constitution.

## D. Open View Doctrine

 Our conclusion that the agents intruded upon the curtilage does not end our analysis, for as the State points out, not all entries by law enforcement officers onto the curtilage of a home infringe upon constitutionally protected expectations of privacy. In *Rigoulot,* this Court held that when police come onto the curtilage of a home for a legitimate purpose and restrict their movements to places where ordinary visitors would be expected to go, their observations from such vantage points are not unlawful. *Id.* at 272, 846 P.2d at 923. Applying this principle in *Clark,* 124 Idaho 308, 859 P.2d 344, we noted that the direct access routes to the house, including parking areas, driveways and pathways to the entry, are areas to which the public is impliedly invited, and that police officers restricting their activity to such areas are permitted the same intrusion and the same level of observation as would be expected from a "reasonably respectful citizen." *Id.* at 313, 859 P.2d at 349. Accordingly, in *Clark,* we held that under this "open view doctrine," police who approached the defendant's house on the driveway and from that vantage point could see through a window and observe drug use activity inside the home, had not conducted a search.

Based upon *Rigoulot* and *Clark,* the State argues that the observations made from Cada's driveway area during the agents' late night visits fall within the open view doctrine and are not the product of an impermissible intrusion within the curtilage. We are not persuaded. The scope of the implied invitation to enter areas of the curtilage that provide direct access to the house—and hence the scope of the open view doctrine—may be exceeded where officers employ a particularly intrusive method of viewing. *State v. Myers,* 117 Wash.2d 332, 815 P.2d 761, 769

(1991); *People v. Thompson,* 221 Cal.App.3d 923, 270 Cal.Rptr. 863, 874 (1990). The Washington Supreme Court has identified several factors to be considered in determining whether an officer exceeded the scope of open view, including whether the officer acted secretly, approached the house in daylight, attempted to talk with the resident, and made the discovery accidentally. *Myers, supra.; State v. Seagull,* 95 Wash.2d 898, 632 P.2d 44, 48–49 (1981). Other authorities also identify the time of day and the openness of the officer's approach as significant in determining the legality of an entry onto private premises. *United States ex rel. Boyance v. Myers,* 398 F.2d 896 (3d Cir.1968); *Davis v. United States,* 327 F.2d 301, 304 (9th Cir. 1964); and *State v. Johnson,* 75 Wash.App. 692, 879 P.2d 984, 991–92 (1994).

 In a case involving the nighttime execution of a search warrant, the Idaho Supreme Court has noted that, "Historically, there has been a strong aversion to nighttime searches." *State v. Lindner,* 100 Idaho 37, 42, 592 P.2d 852, 857 (1979). Referring to I.C. § 19–4411 and I.C.R. 41, each of which requires service of search warrants in the daytime unless an elevated showing has been made to justify authorization for nighttime execution, the Supreme Court stated, "We believe this Court and the Idaho legislature were cognizant of the constitutional significance and greater intrusive nature of nighttime searches when they enacted their respective requirements for nighttime searches." *Id.* If a search pursuant to a warrant, with the safeguard of a prior showing of probable cause to a detached magistrate, may not be undertaken at night absent special justification, we conclude that a late night government intrusion onto the driveway of a home without a warrant may also be prohibited although a similar approach in the daytime would not be.

Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm. As compared to open daytime approaches, surreptitious searches under cover of darkness create a greater risk of armed response—with potentially tragic results—from fearful residents who may mistake the police officers for criminal intruders.

For the foregoing reasons, we conclude that the timing and manner of the two nighttime searches involved in this case place them outside the scope of the open view doctrine articulated in *Rigoulot* and *Clark.* In those cases, the breadth of permissible police activity was tied to that which would be expected of "ordinary visitors," *Rigoulot,* 123 Idaho at 272, 846 P.2d at 923, and "reasonably respectful citizens." *Clark,* 124 Idaho at 313, 859 P.2d at 349. The clandestine intrusion of Agents Thornton and Landers onto Cada's driveway under cover of darkness in the dead of night exceeded the scope of any implied invitation to ordinary visitors and was not conduct to be expected of a reasonably respectful citizen.

While recognizing that law enforcement officers face a profoundly difficult challenge in ferreting out criminal activity and enforcing criminal laws, we must perform the also formidable task of drawing the line between lawful police activity and investigative techniques that violate those standards of personal privacy and individual liberty that are safeguarded by Art. I, § 17 of our constitution. We conclude that the covert, late night intrusions onto the curtilage of Cada's home, for the sole purpose of investigating suspicions of marijuana cultivation, crossed that line.[2]

 Because the evidence gathered through the nighttime entries onto Cada's property was unlawfully obtained, we have

---

**2.** Our decision is not inconsistent with *Clark, supra.* In *Clark,* the police did not act secretively but, rather, approached the residence openly, going to the front door to contact the residents. Although their visit was after dark, at 10 p.m., the timing was not to facilitate a covert observation; it was necessitated by the nature of the police business that prompted the visit—the investigation of a neighbor's complaint of a loud party. In light of the nature of this police business, their visit could not reasonably have been postponed to daylight hours. Further, the officers' observation of illegal drug use within the premises was fortuitous and was not the objective of their visit.

**234**

examined the sufficiency of the remaining evidence presented in support of the warrant application. We conclude, as did the district court, that when the unlawfully obtained evidence is stricken, probable cause for issuance of the warrant was not shown.

Accordingly, the order of the district court suppressing evidence acquired through the nighttime searches of Cada's property and through execution of the search warrant is affirmed.

WALTERS, C.J., and PERRY, J., concur.