NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific Reporter*. *Readers are encouraged to bring typographical or other* *formal errors to the attention of the Clerk of the Appellate Courts.*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| MARGARET A. KELLEY, | Court of Appeals No. A-10882 |
| Appellant, | Trial Court No. 3PA-09-1654 CR |
| v. | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2449 — April 10, 2015 |

Appeal from the Superior Court, Third Judicial District, Palmer, Gregory Heath, Judge.

Appearances: Marjorie Mock, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Court of Appeals Judge.[*]

Judge ALLARD, writing for the Court.
Chief Judge MANNHEIMER, concurring.
Senior Judge COATS, dissenting.

---

[*]    Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Shortly after midnight, acting on an anonymous tip, two Alaska state troopers drove up Margaret A. Kelley's driveway to her residence in Willow, Alaska, rolled down the windows of their idling patrol car, and sniffed the air. After detecting the odor of marijuana, the troopers obtained a warrant to search Kelley's home. During that search they discovered and seized evidence of a commercial marijuana grow.

For the reasons explained here, we conclude that the troopers had no legal right to approach Kelley's home at that time of night, in the manner that they did, to gather evidence of a marijuana grow. Kelley is therefore entitled to suppression of the evidence obtained as a result of this illegal search.

*Facts and proceedings*

Margaret Kelley's home is located at mile 85.5 of the Parks Highway. The residence is rural, set back a considerable distance from the highway, and there are no neighbors close by.

On June 30, 2009, at 12:30 a.m., Sergeant Robert Langendorfer and Investigator Kyle Young drove onto Kelley's property to investigate an anonymous tip that she was growing marijuana to sell.[1] The troopers drove up the driveway and parked their patrol car directly in front of Kelley's house, leaving the engine idling for several minutes. The troopers made no effort to contact the occupants of the residence. Instead, they rolled down the windows of their patrol car and sniffed the air. According to the later search warrant application, they were able to detect the odor of growing or recently harvested marijuana.

Further investigation revealed that Kelley owned the property but that her electrical usage was "unremarkable" — that is, not indicative of a commercial grow

---

[1] The record provides no details about the nature of the tip or when it was received.

operation. Nevertheless, the troopers obtained a warrant to search the property. When they executed the warrant, they discovered numerous marijuana plants and other evidence of a commercial grow operation. Based on this evidence, the State charged Kelley with four counts of fourth-degree misconduct involving a controlled substance.[2]

Kelley moved to suppress the evidence obtained during the search of her home, arguing that the officers unlawfully intruded onto her property when they drove up her driveway after midnight to sniff for narcotics. The trial court denied the motion, ruling that the driveway to Kelley's house was impliedly open to public use because it provided public ingress to and egress from her property, and that the troopers therefore had a right to be there, even after midnight. The court reasoned that "[a] way of ingress or egress does not cease to exist after a certain time of night."

Kelley was then convicted in a bench trial on stipulated facts, and she appealed her conviction to this Court. While her appeal was pending, the United States Supreme Court issued its decision in *Florida v. Jardines*.[3] Because *Jardines* spoke to the propriety of this type of police approach to residential premises, we directed the parties to submit supplemental briefing addressing the case.

We have received that briefing, and we now resolve Kelley's appeal.

---

[2]   AS 11.71.040(a)(2); AS 11.71.040(a)(3)(F) & (G); AS 11.71.040(a)(5).

[3]   133 S. Ct. 1409 (2013).

*Why we conclude that the troopers' conduct was unlawful and that the evidence obtained during the search of Kelley's home must be suppressed*

Under the Fourth Amendment to the United States Constitution and Article 1, Section 14 of the Alaska Constitution, a warrantless search of a home is illegal in the absence of exigent circumstances. This protection against unreasonable searches also extends to the curtilage of the home — those areas immediately surrounding the home in which the resident retains a reasonable expectation of privacy.[4]

However, law enforcement officers may enter an area within the curtilage of a home that is "expressly or impliedly opened to the public use."[5] More specifically, "if police utilize normal means of access to and egress from the house for some legitimate purpose, such as to make inquiries of the occupant, ... it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling."[6] Thus, in *Pistro v. State*, our supreme court held that a police officer could lawfully drive up a driveway and observe stolen property in plain view through the window of the homeowner's garage.[7]

Until now, we have not had occasion to address whether this "public access" exception to the warrant requirement applies to a middle-of-the-night entry into the curtilage of a home.

---

[4]  *See Ingram v. State*, 703 P.2d 415, 427 n.10 (Alaska App. 1985) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)).

[5]  *Pistro v. State*, 590 P.2d 884, 886 (Alaska 1979).

[6]  *Wallace v. State*, 933 P.2d 1157, 1164 (Alaska App. 1997) (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.3(c), at 482-83 (3d ed. 1996)) (internal quotation marks omitted).

[7]  *Pistro*, 590 P.2d at 885-88.

In *Jardines*, the United States Supreme Court recognized that a police officer has an implicit license to approach a home without a warrant and knock on the front door because this is "no more than any private citizen might do."[8] But the Supreme Court also recognized that the scope of this implicit license is limited not only to the normal paths of ingress and egress, but also by the manner of the visit. As the Court explained, "[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to — well, call the police."[9]

Thus, in the majority opinion in *Jardines*, the Supreme Court concluded that the police did not have an implicit license to walk uninvited onto the front porch of a home with a drug-sniffing dog, and the Court therefore upheld the Florida Supreme Court's decision suppressing the evidence obtained as a result of that search.[10]

The case before us involves a trooper sniff,[11] not a dog sniff, and the troopers stayed in their car rather than stepping up onto the porch. But, in another respect, the search in this case was more intrusive than the search in *Jardines*, because it took place after midnight.

---

[8]  *Jardines*, 133 S.Ct. at 1416 (quoting *Kentucky v. King*, 131 S.Ct. 1849, 1862 (2011)).

[9]  *Id.*

[10]  *Id.* at 1416-18; *see also id.* at 1418-20 (Kagan, J., joined by Ginsburg and Sotomayor, JJ., concurring).

[11]  *See Wallace*, 933 P.2d at 1165 (noting that there is no reasonable expectation of privacy from a trooper with "inquisitive nostrils" provided that the trooper is lawfully where he is entitled to be) (quoting 1 Wayne R. LaFave, Search and Seizure, § 2.2(a) at 403 (3d ed.1996)).

Although a late-night search was not before the Court in *Jardines*, both the majority and the dissent in *Jardines* were in agreement that there were clear temporal limits on the implied license for public access to a private residence. As Justice Alito noted in the dissent, a visitor may not "come to the front door in the middle of the night without an express invitation"; indeed, such a late-night intrusion "could be cause for great alarm."[12] The majority referred approvingly to the dissent's "no-night-visits rule," noting that "the typical person would find it 'a cause for great alarm' (the kind of reaction the dissent quite rightly relies upon to justify its no-night-visits rule...) to find a stranger snooping about his front porch *with or without* a dog."[13]

Before and after *Jardines*, courts in other jurisdictions have similarly condemned late-night police incursions onto private property, holding that they are generally outside the scope of the implied license for public access.[14]

---

[12]   *Id.* at 1422 (Alito, J., joined by Roberts, C.J., and Kennedy and Breyer, JJ., dissenting) (citing *State v. Cada*, 923 P.2d 469, 478 (Idaho App. 1996) ("Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm")).

[13]   *Id.* at 1416 n.3 (emphasis in original).

[14]   *See, e.g.*, *United States v. Lundin*, ___ F. Supp. 2d ___, 2014 WL 2918102, at *6 (N.D. Cal. 2014) ("[T]he implied license to visit is generally understood to extend during daylight hours."); *State v. Cada*, 923 P.2d 469, 478 (Idaho App. 1996) (police officers' nighttime intrusion "exceeded the scope of any implied invitation to ordinary visitors and was not conduct to be expected of a reasonably respectful citizen"); *People v. Burns*, ___ N.E.3d ___, 2015 WL 404355, at *8 (Ill. App. Jan. 30, 2015) (condemning warrantless use of drug-detection dog to sniff apartment front door at 3:20 a.m.); *Commonwealth v. Ousley*, 393 S.W.3d 15, 31 (Ky. 2013) (midnight intrusion by police on homeowner's driveway unconstitutional because "[a]bsent an emergency, such as the need to use a phone to dial 911, no reasonable person would expect the public at his door at [that] time[]"); *State v. Ross*, 4 P.3d 130, 136 (Wash. 2000) (suppressing evidence where police used driveway to enter property at 12:10 a.m. to search for evidence of marijuana grow, with no intention of

(continued...)

In *State v. Ross*, for example, the Washington Supreme Court held that law enforcement agents conducted an illegal search when they approached a homeowner's garage shortly after midnight "for the express, and sole, purpose of searching for evidence of a marijuana grow operation in order to obtain a search warrant."[15] In finding the entry unlawful, the Washington Supreme Court emphasized that "[t]he deputies entered the property at 12:10 a.m., an hour when no reasonably respectful citizen would be welcome absent actual invitation or an emergency."[16]

Similarly, in *Commonwealth v. Ousley*, the Kentucky Supreme Court held that a middle-of-the-night police intrusion onto the curtilage of a home to search a garbage can violated the Fourth Amendment.[17] Noting that "the time of the day of the invasion matters," the court held that "just as the police may invade the curtilage without a warrant only to the extent that the public may do so, they may also invade the curtilage only *when* the public may do so."[18]

Here, the record shows (and the State does not dispute), that the troopers entered the constitutionally protected curtilage of Kelley's home when they drove down

---

[14] (...continued)
contacting defendant); *State v. Johnson*, 879 P.2d 984, 991-93 (Wash. App. 1994) (noting that danger of "violent confrontation" considerably heightened during 1:00 a.m. intrusion).

[15] *Ross*, 4 P.3d at 136.

[16] *Id.*

[17] *Ousley*, 393 S.W.3d at 31.

[18] *Id.*; *see also id.* at 30 ("Girl Scouts, pollsters, mail carriers, door-to-door salesmen just do not knock on one's door at midnight; and if they do, they are more likely to be met by an enraged (and possibly armed) resident than one with a welcoming smile.").

her private driveway and parked their car directly in front of Kelley's home.[19] The record also shows (and again, the State does not dispute), that the purpose of this midnight visit was to gather evidence related to the anonymous tip that Kelley was growing marijuana to sell.

There is no allegation that the troopers had prearranged business with Kelley, that they were expecting or intending to have direct contact with her, or that any exigency existed that otherwise justified their conduct. Nor is there any evidence that Kelley impliedly consented to the arrival of visitors after midnight — by, for instance, operating a night-time business from her home or hosting a large, late-night social gathering.[20] Indeed, the State has articulated no reason to justify the troopers' decision to conduct this investigation after midnight instead of during the day, when the investigation would have accorded with the conduct of a respectful citizen and well-settled law.

In urging us to uphold the search, the State emphasizes that, in Alaska in midsummer, it is still light out at 12:30 a.m. But the law's aversion to nighttime searches is not based on the time of sunset, which varies by season, but on the widely recognized right of the individual to privacy and repose in the home at night.[21] We note that in deference to this right, Alaska law requires a search warrant to be executed between the

---

[19] *See Jardines*, 133 S.Ct. at 1415 (defining curtilage as area "immediately surrounding and associated with the home").

[20] The dissent notes that some part of Kelley's driveway was shared with a business. This assertion appears only in the search warrant affidavit, and was never mentioned or relied on by the State in response to Kelley's motion to suppress. As we noted earlier, the State did not dispute Kelley's characterization of her home as "rural in character" and "not close to any adjacent neighbors."

[21] *See State v. Witwer*, 642 P.2d 828, 833 (Alaska App. 1982) (noting that a nighttime search is a "greater violation of privacy" than a daytime search).

hours of 7:00 a.m. and 10:00 p.m., regardless of the season, unless there is good cause to execute the search at some other hour.[22]

In his dissent, Senior Judge Coats observes that a number of courts have upheld late-night police approaches to residences for the purpose of conducting a "knock and talk" with the occupants. But the legal principles that govern a "knock and talk" do not apply here, because the State never asserted, and the record does not show, that the troopers approached Kelley's residence to engage in a knock and talk. As the Kentucky Supreme Court noted in *Ousley*, "[w]here the officer seeks only to search and does not interact with the resident, he has no 'legitimate' purpose as understood in the knock-and-talk cases."[23]

We further note that the knock-and-talk cases cited by the dissent recognize that the lateness of the hour is an important factor to be considered in assessing the overall coerciveness and lawfulness of a knock and talk.[24] Here, we reach our conclusion that the troopers' conduct violated the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Alaska Constitution based on *all* of the circumstances of this case — including the time of night, the troopers' conduct, the State's failure to advance any reason why the troopers could not gather their evidence during the day, or to believe that Kelley impliedly consented to such a late-night visit.

The dissent also suggests that our decision will hamper legitimate night-time police investigations. We disagree. Nothing in our decision bars the police from

---

[22]   Alaska R. Crim. P. 37(a)(3)(C).

[23]   *Commonwealth v. Ousley*, 393 S.W.3d 15, 30 (Ky. 2013).

[24]   *See* Fern L. Kletter, *Construction and Application of Rule Permitting Knock and Talk Visits Under Fourth Amendment and State Constitutions*, 15 A.L.R. 6th 515, § 2 (2006).

approaching a residence late at night when they have good reason to do so.[25]  Likewise, nothing in our decision — or in *Jardines* — bars the police from using the normal means of ingress or egress to approach a residence, even in the absence of an invitation or exigent circumstances, provided that the manner and time in which they do so is consistent with the conduct of an ordinary, respectful citizen.[26]

The search warrant in this case was based almost entirely on the evidence obtained by the troopers' midnight entry onto Kelley's property.  Because the troopers were not in a place where they had a legal right to be when they conducted the sniff, the search warrant they obtained is tainted by the illegal search, and the evidence obtained as a result of the warrant must be suppressed.[27]

*Conclusion*

We REVERSE the judgment of the superior court.

---

[25]  *See, e.g.*, *United States v. McDowell*, 713 F.3d 571, 572-74 (10th Cir. 2013) (affirming denial of suppression motion based on evidence obtained from nighttime driveway sniff where police were on the property because they were attempting to locate suspect in assault investigation).

[26]  *Accord Florida v. Jardines*, 133 S.Ct. 1409, 1415 (2013) ("Complying with the terms of [the implied license for public access] does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.").

[27]  *See Chandler v. State*, 830 P.2d 789, 796 (Alaska App. 1992).

Judge MANNHEIMER, concurring.

I agree with the analysis set forth in the majority opinion, and I write separately only to point out another pertinent aspect of Justice Scalia's majority opinion in *Florida v. Jardines*, __ U.S. __, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013).

As Judge Allard explains, both the majority and the dissent in *Jardines* agree that, for Fourth Amendment purposes, a nighttime entry onto residential property is different from a daytime entry — because the test is whether the entry is within the "implicit license" granted to visitors by the homeowner, and because homeowners have differing expectations regarding daytime and nighttime visitors.

But Justice Scalia's opinion in *Jardines* contains an analysis that is potentially of greater significance to this case, and to future cases: he asserts that "[t]he scope of a [homeowner's implied] license ... is limited not only to a particular [physical] area, *but also to a specific purpose*." *Id.*, 133 S.Ct. at 1416 (emphasis added).

In his opinion, Justice Scalia appears to ratify the approach that (1) police officers, like other citizens, are entitled to take advantage of a homeowner's implied permission to have visitors enter their property, but (2) the scope of that implied permission depends, in part, on the visitor's purpose, and (3) homeowners typically do not consent to have visitors enter their property to investigate crimes that the homeowner might have committed. [1]

Justice Scalia's approach potentially raises significant Fourth Amendment questions. However, I conclude that we should not pursue this matter further in Kelley's case. The parties' briefs do not raise this point, and the facts of Kelley's case do not require us to resolve the additional questions raised by Justice Scalia's opinion.

---

[1]   *See Jardines*, 133 S.Ct. at 1416-17 & n. 4.

COATS, Senior Judge, dissenting.

The facts in this case are undisputed. The Alaska State Troopers received a tip that Margaret Kelley was growing and selling marijuana at her residence at mile 85.5 of the Parks Highway. At approximately 12:30 a.m. on June 30, 2009, two members of the Mat-Su drug unit, Investigator Young and Sergeant Langendorfer, pulled into the driveway of Kelley's residence.

While still in their vehicle, both troopers smelled the odor of "fresh marijuana." The troopers were directly in front of, and downwind from, Kelley's residence. Moreover, there were no other nearby residences upwind of the Kelley residence. There was no indication that Kelley's residence was occupied, and the troopers left without attempting to contact anyone.

Based primarily on this information, the police obtained and served a search warrant on Kelley's residence. They found a number of marijuana plants as well as marijuana growing equipment. Based on this evidence, the grand jury indicted Kelley on four counts of misconduct involving a controlled substance in the fourth degree.

Kelley filed a motion to suppress in which she argued that the troopers conducted an illegal search under Article I, Section 14 of the Alaska Constitution and violated her right to privacy under Article I, Section 22 of the Alaska Constitution.

Superior Court Judge Gregory Heath denied the motion to suppress and Kelley was then convicted in a bench trial based on stipulated facts.

The majority of this Court reverses Kelley's conviction, concluding that the police acted illegally by entering her property at 12:30 a.m. to investigate the tip that she was growing marijuana.

Alaska law provides that law enforcement officers may enter onto private property to conduct an investigation without a warrant if they restrict their movements

– 12 – 2449

to places where an ordinary visitor would be expected to go.[1] There are no Alaska cases that restrict the time of day or night the police may use a residence's normal means of ingress and egress to investigate a crime.

In this case, Judge Heath found that the troopers entered Kelley's property by means of her driveway, which was the normal way to approach her residence. The troopers did not get out of their vehicle, and they stayed for only a few minutes. Judge Heath assumed that, at 12:30 at night, the officers had the patrol car's headlights on, and that the car's engine made some noise as it approached. The judge concluded that this was not the type of "furtive" nighttime investigation that courts in some other jurisdictions have condemned.[2]

As we recognized in *Michel v. State*,[3] a police investigation is "as legitimate a societal purpose as any other undertaking that would normally take a person to another's front door."[4] In his treatise on search and seizure, Professor LaFave points out that the courts that have directly addressed the issue "have not been inclined to view nocturnal entries upon the curtilage as improper."[5]

---

[1]  *Pistro v. State*, 590 P.2d 884, 886-87 (Alaska 1979); *Michel v. State*, 961 P.2d 436, 438 (Alaska App. 1998).

[2]  Citing *State v. Johnson*, 879 P.2d 984 (Wash. App. 1994), and *State v. Cada*, 923 P.2d 469 (Idaho App. 1996).

[3]  961 P.2d 436.

[4]  *Id.* at 437-38 (quoting *State v. Rigoulot*, 846 P.2d 918, 923 (Idaho App. 1992)).

[5]  1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.3 (c) (5th ed.) (Westlaw, database updated October 2014) (citations omitted).

In finding that the troopers' conduct in this case was illegal, the majority of this Court relies primarily on *Florida v. Jardines*,[6] a United States Supreme Court case. In *Jardines*, the Supreme Court ruled that when the police step onto a homeowner's porch with a drug-sniffing dog to investigate the contents of the home they conduct a "search" within the meaning of the Fourth Amendment.[7] Although *Jardines* did not involve a late-night search, the dissent, written on behalf of four members of the Court, stated that there are limitations on when a visitor may approach the front door of a residence "in the middle of the night without an express invitation."[8] However, the case the dissent relied on for that proposition, *State v. Cada*,[9] held only that the late hour at which a police intrusion takes place is one factor for courts to consider in determining whether the entry was lawful.[10]

The facts of *Cada* are far removed from Kelley's case. In *Cada*, the police entered Cada's property at 1:00 a.m. on June 10, 1993, to set up a thermal imaging device directed at the garage.[11] The officers, at least one of them dressed in camouflage, entered the property again on June 21, 1993, at approximately 4:00 a.m., and hid a motion-activated low-light infrared video camera and two infrared sensors in the bushes across the driveway from the garage.[12]

---

[6]    133 S. Ct. 1409 (2013).

[7]    *Id.* at 1417-18.

[8]    *Id.* at 1422 (Alito, J., dissenting, joined by Roberts, C.J., and Kennedy and Breyer, JJ.)

[9]    923 P.2d 469 (Idaho App. 1996).

[10]    *Id.* at 478.

[11]    *Id.* at 472.

[12]    *Id.*

In *Cada*, the Idaho Court of Appeals held that this police entry was illegal under the Idaho Constitution.[13] The court reasoned that

> furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm. As compared to open daytime approaches, surreptitious searches under cover of darkness create a greater risk of armed response — with potentially tragic results — from fearful residents who may mistake the police officers for criminal intruders.[14]

Similarly, in *State v. Johnson*,[15] the Washington Court of Appeals, applying the state constitution, found that a police entry onto the defendant's property at 1:00 a.m. to investigate a possible marijuana growing operation was illegal. But again, the time of the entry was but one factor the court considered in finding the entry illegal. The police entered the Johnsons' property via a state park, under cover of darkness. They opened a gate marked "Private Property" and "No Trespassing," walked down the road, and took readings from a thermal imaging device aimed at the barn.

The Washington court found that the closed gate marked with "No Trespassing" signs indicated that the Johnsons had a "subjective intent to close their property."[16] The court also concluded that the officers' surreptitious entry onto the Johnsons' property at 1:00 a.m. easily could have resulted in a violent confrontation.[17]

---

[13] *Id.* at 478.

[14] *Id.*

[15] 879 P.2d 984 (Wash. App. 1994).

[16] *Id.* at 992.

[17] *Id.* at 993.

In *State v. Ross*,[18] the Washington Supreme Court likewise condemned a surreptitious police entry onto the defendant's property, in a case the court described as "very similar" to *Johnson*.[19]

In each of these cases, the court considered the entire context of the police entry, not just the time of the entry. Moreover, in finding that the searches were illegal, the courts emphasized that the police had engaged in "furtive activity."

As Judge Heath found, there was no furtive activity in this case. The officers drove their patrol car up Kelley's driveway, presumably with the headlights on, stayed only a few minutes, and did not get out of the car.

I would affirm Judge Heath's decision that this entry was lawful. The troopers' investigation differed markedly from the facts of the out-of-state cases that found nighttime searches illegal. Those cases involved extreme facts, where the police, in an effort to avoid detection, snuck onto the defendant's property under cover of darkness to obtain evidence. In Kelley's case, the troopers simply drove up the driveway in a patrol car and remained there for several minutes, without getting out of the car. The driveway was the normal approach to the house, and the troopers did not open any gates or encounter any "No Trespassing" signs.

This type of approach is unremarkable. Certainly newspapers are routinely delivered at night in this way, as might be advertisements, telephone books, or political material. An individual might drive up a driveway to check an address — or to look for the business that, according to the affidavit in support of the search warrant, shared some portion of Kelley's driveway. I see no basis for excluding the police from making a similar approach.

---

[18]    4 P.3d 130 (Wash. 2000).

[19]    *Id.* at 136.

The majority relies on the fact that Alaska law requires search warrants to be executed between the hours of 7:00 a.m. and 10:00 p.m., unless the State shows good cause. But there is a big difference between driving up the driveway and approaching a house without getting out of the car, and entering a house under the force of a warrant and searching it.

Police officers investigate crime around the clock,[20] and there is no per se rule that prohibits late-night investigations. For instance, courts find that "knock and talk" investigations, where police approach a residence, knock on the door, and talk to witnesses or suspects, are generally reasonable, even if those contacts occur late at night.[21] And courts routinely uphold much more intrusive late-night contacts than the situation presented in Kelley's case.

In my view, the opinion of the Court is not supported by any authority and runs the risk of creating uncertainty about the ability of the police to investigate crime other than during daytime hours. I therefore dissent.

---

[20] *See, e.g.*, *Martin v. State*, 297 P.3d 896, 897-900 (Alaska App. 2013) (police approached a five-unit apartment complex after midnight as part of a drug investigation and saw, through a window, materials used for the manufacture of methamphetamine).

[21] *See* Fern L. Kletter, *Construction and Application of Rule Permitting Knock and Talk Visits Under Fourth Amendment and State Constitutions*, 15 ALR 6th 515 (2006) (stating, "Whether a knock and talk has transformed into a search or seizure is dependent upon the totality of the circumstances of each particular case… . [Where] police officers approached a residence at 2 in the morning but where lights were on inside indicating that people were awake and there was no other evidence indicating that visitors were not welcome to approach the front door of the residence[,]" no Fourth Amendment violation occurred).