# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

MICHAEL CHRISTOPHER FREDERICK,

    Defendant-Appellant.

FOR PUBLICATION
December 8, 2015
9:00 a.m.

No. 323642
Kent Circuit Court
LC No. 14-003216-FH

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v

TODD RANDOLPH VAN DOORNE,

    Defendant-Appellant.

No. 323643
Kent Circuit Court
LC No. 14-003215-FH

Before: TALBOT, C.J., and K. F. KELLY and SERVITTO, JJ.

TALBOT, C. J.

These consolidated cases are before us on remand from our Supreme Court. On remand, our Supreme Court has directed us to consider "whether the 'knock and talk' procedure[s] conducted in" these cases are "consistent with US Const, Am IV, as articulated in *Florida v Jardines*, [___ US ___;] 133 S Ct 1409[; 185 L Ed 2d 495] (2013)."[1] For the reasons discussed herein, we conclude that the knock-and-talk procedures conducted with respect to both Frederick and Van Doorne were consistent with the Fourth Amendment. Accordingly, we affirm the trial court's decision.

---

[1] *People v Frederick*, 497 Mich 993; 861 NW2d 286 (2015); *People v Van Doorne*, 497 Mich 993; 861 NW2d 286 (2015).

## I. FACTS

On March 17, 2014, at approximately 10:15 p.m., the Kent Area Narcotics Enforcement Team (KANET) executed a search warrant at the home of Timothy Scherzer and Alyssa Scherzer. While executing this warrant, the KANET officers learned that the Scherzers, acting as caregivers, had been providing marijuana butter to corrections officers employed by the Kent County Sheriff's Department (KCSD). Scherzer informed the KANET officers that he had given 14 pounds of marijuana butter to one corrections officer, Timothy Bernhardt, who would then act as a "middleman" and distribute the butter to other corrections officers. Frederick and Van Doorne were identified as two corrections officers who received marijuana butter through Bernhardt. Both had been issued medical marijuana cards, and both identified Timothy Scherzer as their caregiver.

Based on this information, the KANET officers contemplated whether to obtain search warrants for the homes of the additional suspects, or alternatively, to simply go to the home of each suspect, knock, and request consent to conduct a search. The officers chose the latter approach. The team, composed that night of seven officers,[2] conducted four knock and talks in the early morning hours of March 18, 2014. The officers first visited Bernhardt and another corrections officer.[3] At approximately 4:00 a.m., the officers, in four unmarked vehicles, arrived at Frederick's home. Each officer was wearing a tactical vest, and each had a handgun holstered at his or her hip. Four officers approached the front door, knocked, and waited. Within a few minutes, Frederick answered the door and spoke to the officers. The officers informed Frederick that his name had come up while conducting a criminal investigation and asked if they could come inside and speak with him. Frederick invited the officers inside. The officers asked if they could see Frederick's marijuana butter, and he agreed. Frederick signed a form granting his consent to conduct a search. The officers also provided Frederick his *Miranda*[4] rights, and Frederick signed a card waiving those rights. Officers recovered marijuana butter from Frederick's home.

The KANET team then traveled to the home of Van Doorne, arriving at approximately 5:30 a.m. Because ice rendered the front door inaccessible, four officers knocked at a side door. Van Doorne awoke and looked outside. Recognizing some of the officers standing outside his home, Van Doorne opened the door and spoke with them. As they had with Frederick, the officers explained the purpose of their visit. Van Doorne, believing that the issue could be resolved by showing the officers his medical marijuana card, invited the officers inside. However, because his dog continued to bark, Van Doorne and the officers decided to speak outside in a van. Once inside the van, Van Doorne signed forms waiving his *Miranda* rights and consenting to a search of his home. Officers recovered marijuana butter from Van Doorne's home.

---

[2] A total of eight officers are members of KANET. However, one officer was unavailable the night of March 17, 2014.

[3] Neither Bernhardt nor this other officer is a party to the instant appeal.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Frederick and Van Doorne were charged with various controlled substances offenses.[5] Both men filed motions to suppress the evidence obtained during the searches. Each made two arguments: (1) their consent to the searches was involuntary, and (2) that the knock-and-talk procedures violated the Fourth Amendment under *Jardines*. After an extensive evidentiary hearing, the trial court denied the motions, concluding that the knock-and-talk procedures were not searches or seizures under the Fourth Amendment, and that both men voluntarily consented to the searches. Frederick and Van Doorne filed separate applications for leave to appeal in this Court, which this Court denied.[6] After further appeal to our Supreme Court, our Supreme Court remanded both cases to this Court to determine whether the knock-and-talk procedures were constitutional in light of *Jardines*.[7]

## II. DISCUSSION

### A. STANDARD OF REVIEW

"We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress."[8] Whether a violation of the Fourth Amendment has occurred is an issue of constitutional law which we review de novo.[9]

### B. THE SCOPE OF OUR INQUIRY

We first address the limited scope of our review of the cases before us. The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[10] Under the plain language of the amendment, "[t]he Fourth Amendment is not a guarantee against all searches and seizures, but only against those that are unreasonable."[11] Thus, in any given Fourth Amendment case, there are two general inquiries to be made: whether a "search or seizure" of a person, area, or object protected by the amendment occurred, and if so, whether that search or seizure was unreasonable.

---

[5] Frederick and Van Doorne were also placed on unpaid leave from their positions with the corrections department.

[6] *People v Frederick*, unpublished order of the Court of Appeals, issued October 15, 2014 (Docket No. 323642); *People v Van Doorne*, unpublished order of the Court of Appeals, issued October 15, 2014 (Docket No. 323643).

[7] *Frederick*, 497 Mich 993; *Van Doorne*, 497 Mich 993.

[8] *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009).

[9] *Id*.

[10] US Const, Am IV.

[11] *People v Shabaz*, 424 Mich 42, 52; 378 NW2d 451 (1985). See also *People v Dagwan*, 269 Mich App 338, 342; 711 NW2d 386 (2005) (under the Fourth Amendment, "not all searches are constitutionally prohibited, only unreasonable searches.").

In this case, however, our inquiry is limited to the question of whether the knock-and-talk procedures utilized in these cases amount to a "search" within the meaning of the Fourth Amendment. To understand the scope of our inquiry, we reiterate that our Supreme Court has directed us to consider only whether the knock-and-talk procedures conducted in these cases were consistent with the Fourth Amendment as articulated in *Jardines*. In *Jardines*, the United States Supreme Court's inquiry was "limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment."[12] The Court did not address whether, assuming a search occurred, the search was reasonable, nor did it address whether a seizure had occurred. Thus, we read our Supreme Court's order as directing us to consider a limited question: whether the knock-and-talk procedures utilized in these consolidated cases are "searches" within the meaning of the Fourth Amendment, as a "search" is defined by *Jardines*.[13] We answer this question in the negative.

## C. *FLORIDA v JARDINES*

The starting point of our analysis is the United States Supreme Court's opinion in *Florida v Jardines*. In *Jardines*, two officers, acting on a tip that a home was being used to grow marijuana, approached the home on foot.[14] The officers were accompanied by a dog trained to detect the odor of narcotics.[15] The dog detected the odor of marijuana and alerted at the base of the home's front door.[16] The officers then used this information to obtain a warrant to search the home.[17] Writing for the majority, Justice Scalia utilized a property-rights framework to determine whether the officers had conducted a search by approaching the home with the drug-sniffing dog.[18]

---

[12] *Jardines*, 133 S Ct at 1414.

[13] Thus, we do not address whether the trial court erred with respect to Frederick's and Van Doorne's contentions that they did not voluntarily consent to the searches of their homes. Nor do we address whether the knock-and-talk procedures became "seizures" under the Fourth Amendment, another argument rejected by the trial court. Such inquiries are outside the limited scope of our review on remand.

[14] *Jardines*, 133 S Ct at 1413.

[15] *Id*.

[16] *Id*.

[17] *Id*. When the warrant was executed, officers found marijuana plants, resulting in charges of marijuana trafficking against Jardines. *Id*.

[18] In a concurrence joined by two other justices, Justice Kagan explained that she "could just as happily have decided [the case] by looking to Jardines' privacy interests." *Id*. at 1418 (KAGAN, J., concurring). Utilizing this framework, Justice Kagan would have simply held that because the officers used a " 'device . . . not in general public use,' " the drug-sniffing dog, to " 'explore details of the home' " that "would not otherwise have [been] discovered without entering the

First, Justice Scalia explained that "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' "[19] Justice Scalia explained that a home's front porch was a "classic exemplar of an area adjacent to the home," commonly known as the "curtilage," which is considered part of a home, and thus, is protected by the Fourth Amendment.[20] Because "the officers' investigation took place in a constitutionally protected area," the question became "whether it was accomplished through an unlicensed physical intrusion."[21] To answer this question, Justice Scalia inquired into whether Jardines "had given his leave (even implicitly) for" the officers to step foot on his property.[22] Justice Scalia then explained:

> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee v. Gratz*, 260 U.S. 127, 136, 43 S Ct 16, 67 L Ed 167 (1922) (HOLMES, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626, 71 S Ct 920, 95 L Ed 1233 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, 563 U.S. [452], ___, 131 S Ct 1849, 1862, 179 L Ed 2d 865 (2011).[23]

In *Jardines*, the majority concluded that the officers exceeded the scope of this implied license, and thus, conducted a search within the meaning of the Fourth Amendment. This was

---

premises[,]" a search occurred. *Id*. at 1419, quoting *Kyllo v United States*, 533 US 27, 40; 121 S Ct 2038; 150 L Ed 2d 94 (2001) (KAGAN, J., concurring).

Justice Scalia found it unnecessary to consider Jardines's privacy interests. Justice Scalia explained that the property-rights framework was the Fourth Amendment's baseline, and that the privacy-interest framework merely added to that baseline. *Id*. at 1417. Having concluded that a search occurred under the property-rights framework, Justice Scalia found it unnecessary to consider whether the same conclusion would be reached under a privacy-interest framework. *Id*.

[19] *Id*. at 1414, quoting *United States v Jones*, 565 US ___, ___ n 3; 132 S Ct 945, 950-951 n 3; 181 L Ed 2d 911 (2012).

[20] *Id*. at 1414-1415.

[21] *Id*. at 1415.

[22] *Id*.

[23] *Id*. at 1415-1416.

because while any ordinary citizen might walk up to the front door of a home and knock, an ordinary citizen would not do so while conducting a search of the premises using a specially trained, drug-sniffing dog.[24] As explained by Justice Scalia, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. . . . [T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search."[25] Thus, Justice Scalia concluded that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment."[26]

## D. *JARDINES* APPLIED

Justice Scalia's implied-license framework has since been utilized by many courts to analyze the constitutional validity of a knock and talk procedure.[27] Using this framework, we conclude that the knock and talks conducted in this case were not "searches" within the meaning of the Fourth Amendment. We begin with the observation that, as *Jardines* makes clear, an ordinary knock and talk is well within the scope of the license that may be " 'implied from the habits of the country[]' . . . ."[28] In general terms, *Jardines* explains that there exists "an implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."[29] And, generally speaking, that is exactly what occurred in both cases now before us. In each instance, officers approached the home, knocked, and waited to be received. And in each instance, the officers were received by the homeowners. *Jardines* plainly condones such conduct.[30] Indeed, even "Jardines conceded . . . the unsurprising proposition that the officers could have lawfully approached his home to knock on the front door in hopes of speaking with him."[31]

In order to find a Fourth Amendment violation, then, there must be circumstances present that would transform what was otherwise a lawful entrance onto private property into an unlawful, warrantless search. In *Jardines*, such circumstances existed because when the officers

---

[24] *Id*. at 1416 ("But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to *that*.").

[25] *Id*.

[26] *Id*. at 1417-1418.

[27] See, e.g., *United States v Walker*, 799 F3d 1361 (CA 11, 2015); *Covey v Assessor of Ohio County*, 777 F3d 186 (CA 4, 2015); *United States v Lundin*, 47 F Supp 3d 1003 (ND Cal, 2014); *JK v State*, 8 NE3d 222 (Ind Ct App, 2014).

[28] *Jardines*, 133 S Ct at 1415, quoting *McKee*, 260 US at 136 (HOLMES, J.).

[29] *Id*. at 1415.

[30] *Id*.

[31] *Id*. at 1415 n 1.

stepped foot on a protected area, they were accompanied by a drug-sniffing dog.[32] Frederick and Van Doorne argue that the time of the knock and talks and the manner in which the officers approached compel a conclusion that each knock and talk was a search under the Fourth Amendment.[33] For the reasons discussed herein, we disagree.

## 1. THE OFFICERS' PURPOSE

Frederick and Van Doorne argue that, based on an objective view of the manner of how the officers conducted the knock and talks, the KANET officers' purpose in conducting the knock and talks exceeded the scope of the implied license discussed in *Jardines*. Frederick and Van Doorne argue that the officers did not intend to speak with them, but rather, intended to conduct a search. We disagree.

First, we clarify that even post-*Jardines*, an officer may conduct a knock and talk with the intent to gain the occupant's consent to a search or to otherwise acquire information from the occupant. That an officer intends to obtain information from the occupant does not transform a knock and talk into an unconstitutional search. Before *Jardines*, this Court held that the knock and talk procedure was constitutional.[34] Our Court explained that one entirely acceptable purpose of a knock and talk is to do exactly what the officers did in these cases – obtain an occupant's consent to conduct a search:

> Generally, the knock and talk procedure is a law enforcement tactic in which the police, who possess some information that they believe warrants further investigation, but that is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence (even knock on the front door), identify themselves as police officers, *and request consent to search for the suspected illegality or illicit items. . . .*

---

[32] *Id*. at 1415-1416 (recognizing that police may enter private property to conduct a knock and talk, "[b]ut introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*."). See also *id*. at 1416 n 4 ("[N]o one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").

[33] Relying on Justice Scalia's description of the knock-and-talk procedure in *Jardines*, Frederick and Van Doorne ask us to adopt a three-part test to evaluate these consolidated cases. Under this proposed test, officers would be required to (1) approach a home by the front path, (2) approach only with the intent to speak with the occupants of the home (and not to conduct a search), and (3) knock promptly, wait briefly, and absent an invitation from the occupant to remain, leave the premises. We find it unnecessary to adopt such a test to decide the matters before us, and as such, decline to adopt this proposed test.

[34] *People v Frohriep*, 247 Mich App 692; 637 NW2d 562 (2001).

We decline defendant's request to hold that the knock and talk procedure is unconstitutional because defendant points to no binding precedent, nor have we found any, prohibiting the police from going to a residence and engaging in a conversation with a person. We conclude that in the context of knock and talk the mere fact that the officers initiated contact with a citizen does not implicate constitutional protections. It is unreasonable to think that simply because one is at home that they are free from having the police come to their house and initiate a conversation. *The fact that the motive for the contact is an attempt to secure permission to conduct a search does not change that reasoning.* We find nothing within a constitutional framework that would preclude the police from setting the process in motion by initiating contact and, consequently, we hold that the knock and talk tactic employed by the police in this case is constitutional.[35]

*Jardines* does not hold to the contrary. In his dissenting opinion in *Jardines*, Justice Alito wrote:

As the majority acknowledges, this implied license to approach the front door extends to the police. See *ante*, at 1415. As we recognized in *Kentucky v. King*, 563 U.S. [452], 131 S Ct 1849, 179 L Ed 2d 865 (2011), police officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a "knock and talk," *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence. . . . Even when the objective of a "knock and talk" is to obtain evidence that will lead to the homeowner's arrest and prosecution, the license to approach still applies. In other words, gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach. . . .

*   *   *

The Court concludes that Detective Bartelt went too far because he had the "*objectiv[e] . . . purpose* to conduct a search." *Ante*, at 1417 (emphasis added). What this means, I take it, is that anyone aware of what Detective Bartelt did would infer that his subjective purpose was to gather evidence. But if this is the Court's point, then a standard "knock and talk" and most other police visits would likewise constitute searches. With the exception of visits to serve warrants or civil process, police almost always approach homes with a purpose of discovering

---

[35] *Id*. at 697-698 (citations omitted). See also *People v Galloway*, 259 Mich App 634, 640; 675 NW2d 883 (2003) ("Knock and talk, as accepted by this Court in *Frohreip*, does not implicate constitutional protections against search and seizure because it uses ordinary citizen contact as a springboard to a consent search."). Federal courts have reached the same conclusion. *Ewolski v City of Brunswick*, 287 F3d 492, 504-505 (CA 6, 2002), quoting *United States v Jones*, 239 F3d 716, 720 (CA 5, 2001) (" 'Federal courts have recognized the "knock and talk" strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity.' ").

information. That is certainly the objective of a "knock and talk." The Court offers no meaningful way of distinguishing the "objective purpose" of a "knock and talk" from the "objective purpose" of Detective Bartelt's conduct here.[36]

In response to Justice Alito's critique, Justice Scalia explained:

> The dissent argues, citing *King*, that "gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach." *Post*, at 1423. That is a false generalization. What *King* establishes is that it is not a Fourth Amendment search to approach the home in order to speak with the occupant, *because all are invited to do that*. The mere "purpose of discovering information," *post*, at 1424, in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment. But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.[37]

We read Justice Scalia's response to the dissent as drawing a line. Police do not violate the Fourth Amendment by approaching a home and seeking to speak with its occupant. Even if police fully intend to acquire information or evidence as a result of this conversation, the line has not been crossed.[38] However, if police enter a protected area not intending to speak with the occupant, but rather, solely to conduct a search, the line has been crossed.[39] In that sense, the knock-and-talk procedure cannot be used by police as a smokescreen. Yet even post-*Jardines*, officers may still approach a home, knock, and if an occupant answers, speak to that occupant. The officers may then ask the occupant for information or for consent to conduct a search.[40]

Several cases help demonstrate when police have crossed the line from a permissible knock and talk to an unconstitutional search or seizure. *Jardines* is one such example. As discussed, the officers in *Jardines* exceeded the scope of the license because they never attempted to speak with anyone, and instead, approached the home while conducting a warrantless search using a drug-sniffing dog. *United States v Ferguson*,[41] a case cited by

---

[36] *Jardines*, 133 S Ct at 1423-1424 (ALITO, J., dissenting).

[37] *Id*. at 1416 n 4.

[38] *Id*. ("The mere purpose of discovering information . . . in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment.") (quotation omitted).

[39] *Id*. ("But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").

[40] *Id*. See also *US v Perea-Rey*, 680 F3d 1179, 1187-1188 (CA 9, 2012) ("[I]t remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.").

[41] *United States v Ferguson*, 43 F Supp 3d 787 (WD Mich, 2014).

Frederick and Van Doorne, is another such example. In *Ferguson*, officers traveled to a home believing that it was being used in an illegal marijuana grow operation.[42] The officers had not obtained a search warrant for the residence.[43] As soon as the officers left their vehicle, "they could smell fresh marijuana and observed surveillance cameras on the garage adjacent to the residence."[44] The defendants appeared, and the officers introduced themselves.[45] After the defendants claimed to be operating a permitted medicinal marijuana operation, one officer asked to see required paperwork.[46] Without asking for consent, the other officer asked one defendant "how many marijuana plants he had in the garage . . . ."[47] The officers then spent the next hour walking around the premises with the defendants, investigating buildings and a recreational vehicle.[48] At the end of this process, the officers presented the defendants with a written consent to search form, which the defendants signed.[49]

The defendants filed a motion to suppress the evidence viewed by the officers, arguing that the officers had conducted a warrantless search of their home, and that the later-signed consent form did not remedy this constitutional violation.[50] The prosecutor argued, in part, that what transpired in the hour before the officers obtained the defendants' written consent "qualified as a permissible 'knock and talk,' claiming that the officers were 'not searching anything' during that first hour."[51] The trial court rejected the argument. Comparing the case to *Jardines*, the trial court concluded that by spending an hour investigating the premises, the officers conduct "objectively reveal[ed] a purpose to conduct a search . . . ."[52] This was because during the hour while the officers were ostensibly conducting a knock and talk, they were unquestionably obtaining information while in areas protected by the Fourth Amendment.[53]

One federal district court has similarly concluded that police violate the Fourth Amendment by entering private property with the sole intent to conduct a warrantless arrest of

---

[42] *Id*. at 789.

[43] *Id*.

[44] *Id*. (citation omitted).

[45] *Id*.

[46] *Id*.

[47] *Id*. at 790.

[48] *Id*.

[49] *Id*.

[50] *Id*. at 792.

[51] *Id*. (citation omitted).

[52] *Id*.

[53] *Id*. at 792-793. The trial court also concluded that the hour-long search was not conducted with either the express or implied consent of the defendants. *Id*. at 793-794.

the homeowner. In *United States v Lundin*,[54] another case relied on by Frederick and Van Doorne, officers sought to arrest a suspected kidnapper, but had not obtained a warrant for his arrest.[55] At approximately 4:00 a.m., officers approached the front door at Lundin's home.[56] The officers knocked, and heard a series of crashes from the rear of the home.[57] Officers identified themselves and ordered Lundin to put his hands in the air and slowly leave the home.[58] Lundin exited the backyard of the home and was taken into custody.[59]

In finding a Fourth Amendment violation, the district court relied on *Jardines* for the rule that "the officers' purpose, as revealed by an objective examination of their behavior, is clearly at least an important factor" when evaluating whether the officers exceeded the scope of the implied license.[60] The court explained that "the behavior of the officers here objectively reveals a purpose to locate [Lundin] so that officers could arrest him. Deputy Aponte had put out a request that Lundin be arrested; he believed that the officers already had probable cause for such an arrest; and the officers who arrived at the home were responding to Deputy Aponte's BOLO [("be on the lookout")]."[61] The court explained that "[u]nder the circumstances of this case, it is very difficult to imagine why the officers would have been seeking to initiate a consensual conversation with Lundin to ask him questions at four o'clock in the morning."[62] Thus, "[j]ust as the officers' clear purpose in *Jardines*—to search the curtilage for evidence—could not be pursued without a warrant, so too was the officers' clear purpose in this case—to arrest a suspect within his home—a goal whose attainment requires a warrant."[63]

The common thread in *Jardines*, *Ferguson*, and *Lundin* is that in each case, the officers' conduct revealed that their intentions went far beyond conducting the type of consensual encounter that constitutes a knock and talk. In *Jardines*, the officers searched for evidence without ever speaking to the occupants of the home; in *Ferguson*, the officers conducted an hour-long investigation of the property before requesting consent to do so; and in *Lundin*, the officers had no reason to step foot on the property other than to arrest its occupant. Thus, in each case, officers crossed the line, exceeding the scope of the implied license discussed in *Jardines*. But here, the circumstances are far different. After discovering that contraband likely existed in the

---

[54] *Lundin*, 47 F Supp 3d 1003.

[55] *Id*. at 1007-1008.

[56] *Id*. at 1008.

[57] *Id*.

[58] *Id*.

[59] *Id*.

[60] *Id*. at 1012.

[61] *Id*.

[62] *Id*.

[63] *Id*. at 1012-1013.

-11-

homes belonging to Frederick and Van Doorne, the officers made a conscious decision to ask each individual for consent to conduct a search rather than obtain a warrant. The officers went to each house, knocked, and made such a request. During the knock and talks, the officers did not attempt to conduct a search, as occurred in *Jardines* and *Ferguson*; they waited until obtaining the affirmative consent of each suspect. And unlike the circumstances in *Lundin*, the officers clearly had a legitimate reason to initiate a conversation with each individual.

Frederick and Van Doorne argue that because seven armed officers "in full tactical gear" approached each house in the early morning hours to conduct the knock and talks, this Court should conclude that the officers "did not come to talk, but rather, came to search the home for marijuana butter they knew was present, and they were not going to leave until they had accomplished their goal." The record reveals no such intention of the officers. First, it is true that seven officers went to each location. These seven officers represented all but one member of the KANET team, the absent member being unavailable that night. Further, only four of the seven officers approached the homes to conduct the knock and talks. The record does not demonstrate that the officers used their numerosity to demand entrance or to overcome the will of Frederick and Van Doorne. Rather, the fact that seven officers traveled to each home demonstrates no more than that the entire team, working together on the investigation, traveled together as the investigation continued into the early morning hours.

Contrary to the assertions made by Frederick and Van Doorne, the KANET officers were not wearing "full tactical gear." Rather, the extent of the "tactical gear" worn by the officers were vests which bore the officers' badges and, in some cases, the KANET symbol.[64] That the officers wore this vest conveys a similar message as the uniform traditionally worn by an ordinary officer. In the same vein, it is also true that the officers were armed, but only in that each had a handgun holstered at the hip—again, the same as any ordinary police officer. These facts do not convey a purpose to do anything other than speak with the occupants of the homes.

Nor does the time of the visits demonstrate that the officers intended to conduct a warrantless search without first speaking to and obtaining the consent of Frederick and Van Doorne. The officers explained that they proceeded at this time of day because they had only learned that Frederick and Van Doorne were recipients of marijuana butter through a search conducted a few hours prior to the knock and talks. They feared that if they did not act quickly, Frederick and Van Doorne might be informed of the investigation and destroy evidence. Nothing in the record indicates that the officers chose to proceed at this time of day in order to frighten or intimidate either man, or to otherwise use the time of day to their advantage. That the officers proceeded in the early morning hours does not demonstrate that the officers intended to conduct a search without first obtaining consent.

Rather, the officers' intent is most clearly demonstrated by their conduct at each home. As in any ordinary knock and talk, the officers approached each home, knocked, and waited for a response. When Frederick and Van Doorne responded, the officers explained the purpose of

---

[64] Specifically, one officer testified that the vests were "[b]lack nylon with [a] 'Sheriff' logo on one side, [a] badge on the other side and our KANET patch."

their visits. Both men were provided their *Miranda* rights and asked to voluntarily consent to a search. The officers made no attempt to search for evidence until obtaining consent to do so. That the officers proceeded in this manner clearly demonstrates that it was their intent to speak with each individual and obtain their consent before proceeding any further. Frederick's and Van Doorne's contention that the officers would have conducted a warrantless search with or without their consent is purely speculation.[65] Thus, we conclude that the officers' purpose did not exceed the scope of the implied license as articulated in *Jardines*.

## 2. THE TIME OF THE VISITS

Frederick and Van Doorne next argue that the time of the visits exceeded the scope of the implied license to enter their property. They argue that the habits of this country do not allow "uninvited visits" in the early morning hours, "absent some indication that the person accepts visitors at that hour or, where it is clearly observed that someone is awake in the home." We disagree.

This argument stems from Justice Alito's opinion in *Jardines*. In his dissent, Justice Alito opined that the implied license to enter one's property "has certain spatial and temporal limits."[66] As an example of these limits, Justice Alito stated:

> Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation. See *State v. Cada*, 129 Idaho 224, 233, 923 P.2d 469 (App.1996) ("Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm[.]").[67]

The majority indicated some approval of this statement in a footnote, writing, "We think a typical person would find it a cause for great alarm (the kind of reaction the dissent quite rightly relies upon to justify its no-night-visits rule, *post*, at 1422) to find a stranger snooping about his front porch *with or without* a dog."[68]

---

[65] Rather, from the record before us, it appears equally likely (if not more so) that had Frederick and Van Doorne failed to respond, the officers would have retreated to their vehicles and considered other options. See *Perea-Rey*, 680 F3d at 1188 ("[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." (quotation omitted). However, because both Frederick and Van Doorne responded, there was no need for the officers to retreat.

[66] *Jardines*, 133 S Ct at 1422 (ALITO, J., dissenting).

[67] *Id*. (ALITO, J., dissenting).

[68] *Id*. at 1416 n 3 (quotation marks omitted).

Based on Justice Scalia's reference to Justice Alito's comment, the time of a visit by police officers may be relevant when evaluating the constitutional validity of a knock and talk.[69] But we do not read *Jardines* as adopting any sort of bright-line rule that prohibits officers from entering an area protected by the Fourth Amendment at certain times of day. Rather, the basis for finding that the time of a visit is relevant to the scope of the implied license was articulated by the *Jardines* majority when it stated, "a typical person would find it a cause for great alarm (*the kind of reaction* the dissent quite rightly relies upon to justify its no-night-visits rule, *post*, at 1422) to find a stranger snooping about his front porch *with or without* a dog."[70] Thus, it is not simply the presence of a person at a particular time, but rather, the reaction that a typical person would have to that individual's presence, that determines whether the scope of the implied license has been exceeded. How a typical person would react depends on more than the time of day. For example, the implied license at issue here might not extend to a midnight visitor looking through garbage bins[71] or peeking in the windows. But it may well extend to a midnight visitor seeking emergency assistance,[72] or to a pre-dawn visitor delivering the newspaper. Similarly, while a typical person may well find the presence of uniformed police officers on their doorstep in the early hours of the morning "unwelcome," we cannot conclude that it is, without more, the type of circumstance that would lead an average person "to—well, call the police."[73]

The case relied on by Justice Alito when stating his "no-night-visits" rule provides an example of when officers conducting an early-morning visit to private property did exceed the scope of the implied license. In *Cada*:

> At about 1 a.m. on June 10, 1993, Agent Thornton returned to the Cada property with Agent Landers. The two walked from the county road up Cada's driveway. While on the driveway both agents smelled growing or freshly cultivated marijuana. The odor appeared to be coming from a garage located about 110 feet from the house. The agents continued on the driveway to an area between the garage and the house. They then set up a thermal imaging device and directed it at the garage. The device is a passive, non-intrusive system that detects the surface temperature of an object. The agents concluded that heat coming from the garage was consistent with the amount of heat which would be necessary to

---

[69] See, e.g., *Kelley*, 347 P3d at 1014-1016. This, however, is not necessarily a new requirement found in *Jardines*. Several cases predating *Jardines* have discussed the relevance of the time a knock and talk is conducted when evaluating the circumstances of a particular case. See *id*. at 1015 and n 14 (collecting cases).

[70] *Jardines*, 133 S Ct at 1416 n 3 (quotation marks omitted, some emphasis added).

[71] See *Commonwealth v Ousley*, 393 SW3d 15 (Ky, 2013).

[72] See *id*. at 19, 31 ("Absent an emergency, such as the need to use a phone to dial 911, no reasonable person would expect the public at his door" at the time an officer searched trash cans on private property, 11:30 p.m. and 12:30 a.m.).

[73] *Jardines*, 133 S Ct at 1416.

grow marijuana. The agents were on the property approximately ten to fifteen minutes during this entry.

The agents returned to the Cada property on June 21, 1993, at approximately 4 a.m. One or both of them wore camouflage clothing. Landers again smelled marijuana coming from the garage. On this visit the agents heard a noise coming from the back of the garage that sounded like an exhaust fan. Agent Thornton testified that in his experience indoor marijuana cultivation operations often have an exhaust system. Thornton set up a motion-activated low light infrared video camera and two infrared sensors in a position hidden among bushes across the driveway from the garage. The camera was focused on the garage. This intrusion onto Cada's property lasted about 45 minutes.[74]

The agents then utilized the information gleaned from these night-time intrusions to obtain a warrant.[75] In concluding this conduct exceeded the open view doctrine, the court explained:

Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm. As compared to open daytime approaches, surreptitious searches under cover of darkness create a greater risk of armed response—with potentially tragic results—from fearful residents who may mistake the police officers for criminal intruders.

For the foregoing reasons, we conclude that the timing and manner of the two nighttime searches involved in this case place them outside the scope of the open view doctrine articulated in [State v ]Rigoulot[, 123 Idaho 267; 846 P2d 918 (1992)] and [State v] Clark[, 124 Idaho 308; 859 P2d 344 (1993)]. In those cases, the breadth of permissible police activity was tied to that which would be expected of "ordinary visitors," Rigoulot, 123 Idaho at 272, 846 P.2d at 923, and "reasonably respectful citizens." Clark, 124 Idaho at 313, 859 P.2d at 349. The clandestine intrusion of Agents Thornton and Landers onto Cada's driveway under cover of darkness in the dead of night exceeded the scope of any implied invitation to ordinary visitors and was not conduct to be expected of a reasonably respectful citizen.[76]

Thus, in Cada, it was not simply that the officers entered the premises in the early hours of the morning that created the constitutional problem. Rather, it was that the officers used the "cover of darkness" to conduct a "clandestine intrusion" of the property that caused them to

---

[74] Cada, 129 Idaho at 227.

[75] Id.

[76] Id. at 233.

-15-

exceed "the scope of any implied invitation to ordinary visitors . . . ."[77]  This type of "furtive intrusion late at night or in the predawn hours" is not the type of "conduct that is expected from ordinary visitors[,]" and thus, could lead to "potentially tragic results . . . ."[78]

In nearly every relevant way, the conduct that occurred in this case is the exact opposite of what occurred in *Cada*.  Officers did not furtively approach either home; the officers walked directly to the homes and knocked.  There was nothing clandestine about their behavior.  And rather than refuse to come to the door or call the police, both Frederick and Van Doorne answered the door and spoke with the officers.  What occurred in the cases before us was not a " '[f]urtive intrusion late at night or in the predawn hours' " that " 'if observed by a resident of the premises . . . could be a cause for great alarm[.]' "[79]  Thus, although the officers visited the homes in the early hours of the morning, under the circumstances of these cases, that fact does not render the knock and talks unconstitutional.

### 3.  "COMMUNITY STANDARDS"

Finally, Frederick and Van Doorne argue that the officers "failed to follow community standards" by "incessantly" pounding on each door until the officers received an answer.  The record simply does not support these factual assertions.  As found by the trial court, the officers knocked on each door and waited a few minutes for someone to respond.  This factual conclusion was supported by the testimony of several officers, all of whom testified to knocking on each door and waiting a matter of minutes for a response.  Frederick's and Van Doorne's argument lacks merit.

Affirmed.


/s/ Michael J. Talbot
/s/ Kirsten Frank Kelly

---

[77] *Id*.

[78] *Id*.  Other cases have similarly concluded that *clandestine* entries into areas protected by the Fourth Amendment are unconstitutional.  See *State v Ross*, 141 Wash 2d 304; 4 P3d 130 (2000) (without attempting to contact a home's occupants, police entered the property shortly after midnight and in plain clothes to check for the odor of marijuana emanating from a garage); *State v Johnson*, 75 Wash App 692; 879 P 2d 984 (1994) (Police entered private property via a state park at night, through a gate marked "Private Property" and "No Trespassing," and then used a thermal imaging device to investigate a barn).

[79] *Jardines*, 133 S Ct at 1422, quoting *Cada*, 129 Idaho at 233 (ALITO, J., dissenting).