IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 10, 2024 Session

## STATE OF TENNESSEE v. JOHN HOUSTON-POLK, III

**Appeal from the Circuit Court for Rutherford County**
**No. 2019-CR-82310          James A. Turner, Judge**

_____

### No. M2023-01117-CCA-R3-CD
_____

The Defendant, John Houston-Polk, III, was convicted in a Rutherford County Circuit Court bench trial of simple possession of methamphetamine, a Class A misdemeanor; resisting arrest, a Class B misdemeanor; and possession of drug paraphernalia, a Class A misdemeanor, and sentenced to six months in the county jail with the first 30 days to be served at 100% and the sentence to be served consecutively to the Defendant's sentences in two general sessions court cases. The sole issue the Defendant raises on appeal is whether the trial court erred in denying his motion to suppress evidence found during the search of his vehicle parked in the driveway of his parents' home. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Carl Benjamin Lewis, Murfreesboro, Tennessee (on appeal and at trial) and John G. Mitchell, III (at suppression hearing), for the appellant, John Houston-Polk, III.

Jonathan Skrmetti, Attorney General and Reporter; Brooke A. Huppenthal, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Dana Minor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

At approximately 1:53 a.m. on February 16, 2019, Murfreesboro Police Department ("MPD") Officer Cordario Eatmon, who was patrolling a residential area where there had been a recent string of car burglaries, noticed a vehicle with its running lights on parked near another vehicle in the driveway of a residence. When he passed the home again a few minutes later and saw that the vehicle's running lights were still on, he parked his patrol vehicle on the street and began walking up the driveway to investigate. As he approached the Defendant's open driver's window and began talking to the Defendant, he smelled the odor of marijuana. The forty-one-year-old Defendant identified himself, stated that he lived at the residence, and provided the correct address for the house. However, the Defendant was not compliant with Officer Eatmon's command to exit the vehicle and eventually had to be forcibly removed by Officer Eatmon and two other MPD officers who arrived as backup. A search of the vehicle following the Defendant's arrest uncovered methamphetamine, Suboxone, Clonazepam, marijuana, a set of digital scales, two cut straws, a glass pipe and $843 in cash. The Rutherford County Grand Jury subsequently returned a six-count indictment charging the Defendant in Count One with possession of more than 0.5 grams of a Schedule II controlled substance containing methamphetamine with the intent to manufacture, deliver, or sell; in Count Two with the possession of Suboxone; in Count Three with the possession of Clonazepam; in Count Four with the possession of marijuana; in Count Five with resisting arrest; and in Count Six with possession of drug paraphernalia.

On June 8, 2020, the Defendant filed a motion to suppress, arguing that the evidence was seized in violation of his Fourth Amendment right to be free from unreasonable search and seizure because he had a reasonable expectation of privacy while inside his vehicle parked within the curtilage of his home, the search was performed without a warrant, and none of the valid exceptions to the warrant requirement applied.

At the August 28, 2020 suppression hearing, Officer Eatmon testified that on the night of February 16, 2019, he was patrolling an area that included the neighborhood where the incident occurred, known in the MPD as "Zone 3." He stated that there had been a rise in burglaries and vehicle burglaries in the area, and that he was on the alert for "suspicious activity[,]" which included vehicles that had their doors ajar or their dome or other lights on. At 1:53 a.m., he was driving past a residence on Shagbark Trail when he noticed a vehicle parked in the driveway with its running lights on. Although it was uncommon to see at that time of night, he did not immediately stop but continued patrolling through the neighborhood.

When he came back past the address approximately three to five minutes later, he saw that the vehicle's running lights were still on. Concerned that the vehicle might have

been burglarized or that a resident had left its lights on, he parked on the street and began walking up the driveway to the vehicle. When he reached the vehicle, he saw that the driver's seat was occupied by the Defendant. Upon questioning, the Defendant provided his name and the address of the residence and informed Officer Eatmon that he lived there.

Officer Eatmon testified that he detected the odor of marijuana as he was talking to the Defendant. He said he asked the Defendant if he had any marijuana on his person or in the vehicle. The Defendant replied that he did not, but that he had smoked it earlier. Officer Eatmon stated that he determined that he had probable cause to search the vehicle and therefore requested backup. After MPD Officer Woodard arrived on the scene, Officer Eatmon instructed the Defendant to exit the vehicle, but the Defendant refused despite multiple repeated commands from both Officer Eatmon and Officer Woodard. MPD Officer Sorenson arrived as additional backup, and Officer Sorenson entered the passenger side of the vehicle to release the Defendant's hands from the steering wheel, enabling Officers Eatmon and Woodard to forcibly remove the Defendant from the vehicle and place him under arrest.

Officer Eatmon testified that his search of the vehicle uncovered 3 to 4 grams of methamphetamine; 67 grams of marijuana; drug paraphernalia consisting of two straws, a set of digital scales and a glass pipe with residue; cash; a cell phone; Suboxone, and Clonazepam. When asked if he walked on the grass portion of the property to reach the Defendant's vehicle, he responded that he thought he stayed on the concrete driveway but "m[ay] have walked on the grass a little bit."

On cross-examination, Officer Eatmon testified that the MPD's directive to be on the alert for vehicle burglaries was verbalized during their daily roll calls, with officers instructed to patrol the area more frequently and to make contact and attempt a "field interview" with any individuals observed in the neighborhood. He said that his initial thought upon first seeing the Defendant's vehicle was that a resident might have just exited the vehicle, and the lights of the vehicle had not yet gone off. When he drove back by and saw the lights still on, his concern was that the vehicle had either been burglarized or that the resident had accidentally left the lights on.

When asked if his purpose in entering the property was to perform a knock and talk, he responded, "No." He said the Defendant's vehicle was in the driveway parked beside the garage to the right of a second parked vehicle, testifying that "if you were facing the house, it was in the driveway to the right parked . . . on the outside to the right of another vehicle." He agreed that the driveway was curvy and estimated that the Defendant's vehicle was thirty to fifty feet from the street. He stated that the driver's side window of the vehicle was down. He could not recall with certainty what the Defendant was doing as he approached but thought he might have been looking at his cell phone. He could not

recall if he ran the vehicle's tag before he approached the Defendant. He estimated that he was six feet or less from the Defendant's vehicle as he talked to the Defendant. He was unable to say if the marijuana he smelled was raw or burnt. He said he found the crystal methamphetamine on the driver's seat underneath the Defendant's leg, and the drug paraphernalia, Suboxone, Clonazepam, and marijuana inside a backpack that was in the backseat of the vehicle.

On redirect examination, he testified that his understanding of a "knock-and-talk" was "going up to a residence or any establishment, knocking on the door, talking to someone . . ." He then agreed that he was not there to knock on the residence's door but instead to "knock on that car door[.]"

At the conclusion of the hearing, the trial court overruled the motion to suppress. Accrediting the officer's testimony, the trial court found that the officer's entry onto the property and approach to the Defendant's vehicle, where he smelled the odor of marijuana, "was reasonable given the totality of the circumstances," and "was not a stretch or violative of the property owner's rights or the Defendant's rights[.]"

Counts Two, Three, and Four were nolle prosequied, and the Defendant was tried in a February 16, 2023 bench trial on Counts One, Five, and Six. By the time of the trial, Officer Eatmon was no longer employed with the MPD. The State called as witnesses MPD Officer Sorenson and the chemist who analyzed the methamphetamine found in the Defendant's vehicle, and the Defendant called as witnesses his father and his mother. We will summarize only the portions of the trial testimony that are relevant to the suppression issue raised on appeal.

MPD Officer Sorenson testified that he was working the midnight shift on February 16, 2019, and assigned to Zone 3 "to patrol for individuals breaking into vehicles." "[D]uring that timeframe, there was . . . a special watch [for car burglaries] at the police department" "due to a string of car burglaries" in that area. Among the things he was on the lookout for were "cars that are parked in different positions or running in driveways" and people walking and engaging in suspicious behavior, such as stopping and looking at homes or at vehicles.

Officer Sorenson testified that his partner that night, Officer Eatmon, called dispatch to report that he was performing a "patrol check" on a house in the neighborhood. At some point Officer Eatmon called for assistance, and Officer Sorenson responded to the house. When he arrived, Officers Eatmon and Woodard "were somewhat up the driveway talking to an individual in a vehicle." Officer Sorenson recalled hearing the other two officers asking the Defendant to step out of the vehicle so that they would not have to use force to remove him, and the Defendant's not being compliant with their requests. He said that as

Officers Eatmon and Woodard were struggling to remove the Defendant from the vehicle, he entered the vehicle through the passenger door to control the Defendant's hands. The Defendant was not punching at the officers, "[b]ut he was actively resisting being pulled out of the vehicle by pulling his limbs into his body." Officer Sorenson stated that the vehicle smelled like marijuana, and that he saw a bag of "crystal like substance" either in the driver's seat or in the cup holder.

Officer Sorenson testified that after they arrested the Defendant, Officer Eatmon retrieved his patrol vehicle from the street and pulled it up the driveway, which "wasn't a very short driveway." They then placed the Defendant in the backseat of Officer Eatmon's vehicle and searched the Defendant's vehicle. In addition to the small bag of crystalline substance located in the front seat of the vehicle, the officers found a small scale, cut straws, four or five grams of marijuana, approximately $800 in cash, and "a variety of pills."

On cross-examination, Officer Sorenson testified that the special watch for car burglaries had been in place for "an extended amount of time[,]" with additional police units placed in the neighborhood in response. He agreed that the lots in the subdivision were large, that the home's driveway "serpentine[d] up and around the side of the house[,]" and that both vehicles at the residence were parked beside the garage at the end of the driveway. He acknowledged that the space between the two parked vehicles was "tight" with perhaps as little as three feet between them. He said that, faced with a similar situation, he would have walked up to the vehicle as Officer Eatmon did.

The Defendant's father and mother testified that the Defendant lived part of the time with them at their Shagbark Trail home and part of the time with his girlfriend, coming and going at will.

Before issuing its verdicts, the trial court briefly addressed defense counsel's argument in closing that the original judge in the case erroneously denied the motion to suppress. The trial court first noted that it was "not the appellate court for [the original trial judge]." Nevertheless, it observed based on its viewing of the MPD dashcam videos that it was "not an unusually long driveway" and found that the officer "was appropriately investigating something that appeared to be suspicious" when he encountered the Defendant and smelled marijuana, and that his subsequent seizure of the evidence was lawful. The trial court then found the Defendant guilty in Count One of the lesser offense of simple possession of methamphetamine and guilty in Counts Five and Six of the indicted offenses of resisting arrest and possession of drug paraphernalia. The trial court sentenced the Defendant to an effective term of six months in the county jail, to be served consecutively to his sentences in two general sessions court cases. Thereafter, the Defendant filed a timely notice of appeal to this court in which he challenges the trial court's ruling on his motion to suppress.

## ANALYSIS

The Defendant contends that the trial court erred in denying his motion to suppress, arguing that the officer "violated his Fourth Amendment right to be free from an unreasonable, warrantless search and seizure while he sat in his vehicle parked in the curtilage of his parents' home where he was residing." He asserts that no applicable exception to the warrant requirement existed that would have allowed the officer to lawfully approach his vehicle and argues that all evidence from the ensuing search and seizure should have been suppressed as fruit of the poisonous tree. On appeal, the State argues that the trial court properly denied the motion to suppress because the officer did not enter the home's curtilage and had probable cause for the search after plainly smelling marijuana.

We consider the evidence presented at the suppression hearing and at trial in evaluating a trial court's ruling on a motion to suppress. *State v. Christensen*, 517 S.W.3d 60, 68 (Tenn. 2017) (*citing State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1999)). When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. *Christensen*, 517 S.W.3d at 68 (citing *Odom*, 928 S.W.2d at 23). However, the application of the law to the facts found by the trial court is a question of law that is reviewed de novo. *Id.* (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)).

Both the United States and Tennessee constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. I, § 7. Generally, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). "Under both constitutional guarantees, reasonableness is the ultimate touchstone." *State v. Stanfield*, 554 S.W.3d 1, 9 (Tenn. 2018) (citations and internal quotation marks omitted).

At the suppression hearing, and again on appeal, the Defendant argued that the driveway where he was parked was part of his home's curtilage, and that there were no valid exceptions that would have allowed Officer Eatmon to lawfully bypass his home's

front door and approach his vehicle.  At the suppression hearing, the prosecutor, apparently conceding that the area was part of the home's curtilage, argued, among other things, that the officer lawfully entered the driveway that was clearly open to the public to conduct what amounted to an investigatory "knock-and- talk."

The curtilage of a home is "any area adjacent to a residence in which an individual can reasonably expect privacy[.]" *Christensen*, 517 S.W.3d at 69 (internal quotations and citations omitted).  "There is no bright-line rule delineating the inclusion or exclusion of a given driveway within a house's curtilage for Fourth Amendment purposes." *Id.* (citation omitted).  The United States Supreme Court has, however, provided the following four factors to consider in determining whether an area is part of a home's curtilage:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987) (citations omitted).

In denying the motion to suppress, the trial court did not specifically address whether the Defendant's vehicle was parked in the curtilage of the home, finding only that the officer's actions were reasonable under the totality of the circumstances and not violative of the Defendant's rights.  The trial court's ruling states in pertinent part:

> Officer Eatmon's testimony is that he was driving through the neighborhood, he had been alerted to an uptick or an increase in auto burglaries in that area in the community.  And as a result, being attentive to those things that might lead someone to believe that there could be auto burglaries taking place or someone could be - - something could be going on that would evidence what it was that he had been told to be on the lookout for.

> He saw the car sitting with its running lights on and drove past, and went on and did some more patrolling, then came back three to five minutes later and saw the car, and the lights were still on.  At that time, he exited his car, walked up to the car, and smelled the odor of marijuana.

> The Court finds the officer's testimony is credible.  Finds that his entry onto the property was reasonable given the totality of the circumstances, the time at night, the criminal activity in the area that he had been warned to be on the lookout for.  And his approach to the car to find out

whether there was something wrong going on was not a stretch or violative of the property owner's rights or the Defendant's rights in this case, and would deny the motion to suppress at this time.

We conclude that the trial court properly denied the motion to suppress. Initially, although it is not a determinative issue under the facts of this case, we agree with the State that the area in which the Defendant was parked was not part of the home's curtilage. Applying the *Dunn* factors, the garage beside which the Defendant's vehicle was parked appears from the officers' dashcam videos to be located on the right side of the home's front door and very close to the house. However, there was no evidence that the front yard of the house was fenced, or the driveway gated. Nor was there evidence that any portion of the driveway, including the area near the garage that the Defendant asserts he used for personal ingress and egress into the residence, was blocked from use by the public. Moreover, according to the officer's testimony, supported by the dashcam videos, the Defendant's vehicle was located only thirty to fifty feet from the street and was not hidden by any vegetation or structures. "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Collins v. Virginia*, 584 U.S. 586, 592-93 (2018) (quoting *California v. Ciraolo*, 476 U.S. 207, 212-213 (1986)). The area in which the Defendant was parked in the open driveway beside the garage was not one "intimately linked to the home" where the residents' "privacy expectations" were "most heightened."

Even assuming, *arguendo*, that the area where the Defendant was parked was part of the curtilage of the home, the officer's entry onto the property and approach to the Defendant's vehicle did not constitute a Fourth Amendment search. Under the "implicit license" that a home's front door knocker presents, a police officer may, without a warrant, "approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Christensen*, 517 S.W. 3d at 70 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). As our supreme court in *Christensen* explained:

> Thus, a so-called "knock-and-talk" is not a "search" as that term is understood within the context of the Fourth Amendment, at least if the intrusion is conducted within the scope of the implicit license recognized by the Supreme Court in [*Florida v.*] *Jardines* [569 U.S. 1 (2013)]. Rather, only if an officer's conduct in approaching a front door "objectively reveals a purpose to conduct a search," such as by bringing a drug-sniffing dog onto the front porch, will his approach offend the Fourth Amendment. *Jardines,* [569 U.S. at 11-12]; *see also People v. Frederick*, 313 Mich. App. 457, 886 N.W.2d 1, 9 (2015) (stating that, under *Jardines*, officers "do not violate the Fourth Amendment by approaching a home and seeking to speak with its

occupant. . . However, if police enter a protected area not intending to speak with the occupant, but rather, solely to conduct a search, the line has been crossed").

517 S.W.3d at 70.

In *Christensen*, our supreme court held that police officers' entry onto a defendant's property to conduct a "knock-and-talk" in their investigation of reports of a methamphetamine laboratory on the property did not constitute a Fourth Amendment violation, despite no trespassing signs posted at the entrance to the property. In reaching this conclusion, the *Christensen* Court applied the "reasonable expectations" test:

> Under the reasonable-expectations test, a warrantless intrusion by government agents onto a homeowner's real property does not violate either the federal or state constitution unless the intrusion violates the homeowner's "reasonable expectation of privacy." *See Katz* [*v. United States*], 389 U.S. [347,] 361, [(1967)], (Harlan, J., concurring); [*State v.*] *Talley,* 307 S.W.3d [723,] 730 (Tenn. 2010)]. Initially, it is the homeowner's burden to establish that he had a "reasonable expectation of privacy" against the intrusion. *Talley*, 307 S.W.3d at 730. The homeowner must satisfy two prongs: (1) that he had "an actual, subjective expectation of privacy," and (2) that "society is willing to view [his] subjective expectation of privacy as reasonable and justifiable under the circumstances." *Id.* (quoting *State v. Munn*, 56 S.W.3d 486, 494 (Tenn. 2001)). We examine the totality of the circumstances in determining the reasonableness of a claimed expectation of privacy. *Id.* at 734.

*Id.* at 77-78.

Unlike in *Christensen*, the property in the case at bar was not posted with no trespassing signs, and Officer Eatmon did not enter the property based on his having received a specific tip that illegal activity was occurring there. Instead, Officer Eatmon was patrolling a neighborhood where a string of car burglaries had recently occurred, noticed the Defendant's vehicle with its running lights on parked very close to a second vehicle in the driveway, decided to investigate, and walked up the open, unblocked driveway to the Defendant's vehicle, where he smelled the odor of marijuana. We agree with the trial court that Officer Eatmon's approach to the Defendant's vehicle "to find out whether there was something wrong going on was not . . . violative of the property owner's rights or the Defendant's rights[.]"

## CONCLUSION

Based on our review, we conclude that the trial court properly denied the Defendant's motion to suppress. Accordingly, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE